ILLINOIS TOOL WORKS INC., Plaintiff-Appellant, Cross-Appellee, *v.* MICHAEL KOVAC *et al.*, Defendants-Appellees, Cross-Appellants.

Second District (2nd Division)   No. 75-278

Opinion filed November 15, 1976.

Max Wildman and Douglas R. Carlson, of Wildman, Harrold, Allen & Dixon, and James A. Velde and Thomas Campbell, of Gardner, Carton & Douglas, all of Chicago, for appellant.

William A. Marshall, Owen J. Murray, and Dale A. Kubly, of Merriam, Marshall, Shapiro & Klose, of Chicago, for appellee Michael Kovac *et al.*, and Miller & Summit, of New York City, for appellee Packaging Industries, Inc.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Plaintiff, Illinois Tool Works Inc. (ITW), appeals from the judgment of the circuit court of Lake County, following a bench trial, finding the issues in favor of defendants-appellees, dismissing the complaint for injunctive and other relief, and later, denying ITW's post-trial motion. Defendants, Michael Kovac (Kovac), Ernest R. Cunningham, Jr. (Cunningham), and Grip-Pak, Inc. (G-P), cross-appealed from the circuit court's denial of defendants' motion under section 41 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 41) and Supreme Court Rule 209 (ch. 110A, par. 209), for an order to tax the defendants' reasonable expenses and attorneys' fees against ITW.

ITW is a multidivisional corporation whose Hi-Cone Division is engaged in the manufacture and sale of various forms of plastic multipack carriers used in packing beer, soft drinks and juice. Kovac was in the employ of ITW as "house attorney," primarily in the field of patent law, from July, 1963, to February 12, 1971. Cunningham was employed by ITW as an engineer from October, 1961, to November 1, 1968. (A third defendant, Packaging Industries, Inc. (Packaging), a manufacturer of plastic products and packaging machinery for plastic products, and G-P's licensee, was dismissed as a party defendant on its own motion at the close of plaintiff's case. Packaging was party to this appeal and it also cross-appealed from the circuit court's denial of its motion under section 41 of the Civil Practice Act for its reasonable expenses and attorneys' fees in defending ITW's suit. Subsequently, ITW's appeal from Packaging's dismissal at the close of the plaintiff's case and Packaging's cross-appeal were withdrawn.)

ITW's complaint filed May 21, 1973, in effect, alleged a conspiracy by defendants to misappropriate and exploit ITW's confidences and secrets in violation of the attorney-client relationship, and in violation of "Patent and Confidential Information Employment Agreements" executed by Kovac and Cunningham, and of the duty implicit in their employment relations. In addition, it alleged that in furtherance of such conspiracy

they fabricated prototypes of plastic multipack carriers and are threatening to market them, as was shown by defendants' exhibiting them at the trade show in May, 1973. It further alleged that "[t]hese activities by Kovac and [Packaging] were a tortious act." The complaint sought (1) to enjoin the defendants from producing, developing and marketing plastic multipack carriers resulting from "secrets and confidences" acquired by defendant Kovac in his attorney-client relationship with ITW, or which would be in violation of the duties implicit in Kovac's and Cunningham's employment relationship and their employment agreements with ITW, and from using or disclosing such information, and (2) to enjoin G-P and Packaging from entering into and continuing any relationship with Kovac and Cunningham relating to the production, development and marketing of plastic multipack carriers resulting from information obtained by Kovac and Cunningham in the course of their relationship with ITW. By an amendment to the complaint filed almost one year later, on May 13, 1974, ITW sought an order directing defendants to assign to ITW "all patents, patent applications and patent rights resulting from their use of confidential information obtained during the course of Kovac and Cunningham's employment by ITW."

Defendants, Kovac, Cunningham and G-P, filed their answer asking for dismissal with prejudice of ITW's complaint, as amended, and for a finding that malice is the gist of the action alleged by ITW. They also filed their counterclaim which sought, *inter alia*, to enjoin ITW from seeking to enforce the employment agreements executed by Kovac and Cunningham and from further interference with defendants' business activities.

Following the filing of the complaint the parties conducted extensive discovery, took interrogatories and depositions (including those of Kovac and Cunningham taken by ITW which extend over 1350 pages of transcript, and that of Robert Beart, ITW's senior vice-president and general patent and legal counsel). Defendants produced on ITW's demand therefor, about 3000 documents, including samples and prototypes of their products.

The trial commenced on July 24, 1974. It consumed 21 court days during which over 300 exhibits were received, including many patents and other multipaged documents. The testimony of 11 witnesses, including that of Kovac and Cunningham, was received. The trial transcript covers over 3000 pages. On November 14, 1974, the trial court, after receiving briefs and proposed findings of fact and conclusions of law and orders from the adverse parties, entered its judgment dismissing ITW's complaint, as amended, with prejudice. On February 24, 1975, the trial court denied ITW's post-trial motion and defendants'[1] motion for an

---

[1] In view of the dismissal of the appeal and cross-appeal relating to Packaging, the collective word "defendants" will hereinafter refer only to Kovac, Cunningham and G-P.

order requiring ITW to pay defendants' reasonable expenses and attorneys' fees. The appeal and cross-appeal are from those orders.

ITW contends that (1) the evidence established that Kovac, as ITW's former lawyer-employee, violated his duty of confidence to ITW, and (2) the trial court erred in denying the injunctive and other relief (*i.e.*, assignment by Kovac, Cunningham and G-P of patents, patent applications or patent rights resulting from such alleged violation). In the judgment appealed from the trial court found and concluded (omitting parenthetical references to appropriate exhibits) as follows:

"1. That the inventions relating to Grip-Pak I and II including the carriers per se, the methods of manufacturing the carriers, and the methods of applying the carriers to a multiple of containers in the form of bottles or cans were independently invented by Cunningham.

2. The Grip-Pak I bottle carrier and method of assembling the carrier to form multiple packs are not identical with, based upon, or derived from any of the items which plaintiff claims as trade secrets and confidences, including, but not limited to, (1) Wayne Lyon documents; (2) multiple thickners overlap disclosure; (3) reinforced fingerholes or burned aperture disclosure; (4) method of assembly of the Beart band; Cunningham-Stockdale bottle carrier.

3. The Grip-Pak II scrapless carrier and the method for making the carrier are not identical with, derived from, or based upon any of the items which plaintiff claims are its trade secrets or confidences, including, but not limited to, (1) Poupitch rings; (2) Ron Owen disclosure; (3) carrier perforations.

4. The double tube device shown in figures 7 and 8 of the Ron Owen patent application was derived by plaintiff and Ron Owen from Cunningham's Grip-Pak II invention.

5. The 1966 and 1967 employment agreements of Cunningham and Kovac, respectively, are valid agreements.

6. Cunningham and Kovac have not violated any of the terms of the aforesaid agreements.

7. Cunningham and Kovac did not use or disclose to each other or to others any of the plaintiff's secrets or confidences; Kovac did not breach any duty he owed to plaintiff as a lawyer or as an employee; Cunningham did not breach any duty he owed to plaintiff as an employee.

8. Cunningham, Kovac, and Grip-Pak, Inc. did not enter into a conspiracy or conspire among themselves or with anyone to appropriate any of plaintiff's secrets or confidences.

9. The plaintiff's bringing and prosecuting this case was not malicious.

10. The issues are found to be in favor of the defendants and against the plaintiff and defendants should be awarded their costs but not attorney fees."

ITW argues on appeal that the finding that Kovac did not use or disclose any of the plaintiff's secrets and confidences to others, and did not breach his duty to ITW as its former lawyer, is contrary to the weight of the evidence; and that it is erroneous because it assumes that a lawyer is not guilty of a breach of his duty of confidence without proof that he actually disclosed a secret to others. ITW further argues that the trial court was misled by defendants into believing that this was a "trade secret case" and was based on a tort theory.

It should be pointed out at the outset that, even though it now insists that this is not a trade secret case, ITW's complaint did emphasize the "trade secret" and "tort" concepts, and referred to Kovac's "activities" as "a tortious act." Moreover, the opening statement of ITW's trial counsel (although mentioning a "claimed breach of attorney-client relationship"), stressed the "misuse and appropriation of * * * trade secrets obtained by" Kovac and Cunningham during their employment at ITW, and that "[c]ompetition based upon the misuse and misappropriation of trade secrets and confidential information * * * is improper and should be enjoined." ITW's counsel's closing statement at trial referred to his opening statement and again emphasized that the "second issue is, are the Grip-Pak products derived from ITW's trade secrets." It is apparent that ITW has abandoned the trade secret theory it urged at trial.

Cunningham, a registered professional engineer, was in ITW's employ for about 6 years until November 1, 1968. He is an inventor who holds 27 United States patents (5 of which he obtained before joining ITW and 14 of which are assigned to ITW). One of his inventions is a Model 500 carrier applicating machine for applying plastic multipack carriers. During his employment at ITW, Kovac and Beart prepared and prosecuted patent applications for Cunningham which were assigned to ITW. Kovac and Beart also did "some cleanup work on a patent that Mr. Cunningham licensed" to another company, on which "Beart did about 98% of the work."

After leaving ITW, Cunningham's next job was with Barr Stalfort Co. as a research and development engineer. He remained there until May, 1973. During his employment there be invented a multipack bottle carrier (later named Grip-Pak I), which he offered to assign to his employer. He also attempted to induce his employer to enter into the manufacture and sale of that product. However, Barr Stalfort, whose primary business is

filling aerosol containers, chose not to pursue it and released the invention to Cunningham (reserving to itself a royalty-free right to use any resulting product or device).

After Cunningham left ITW he had only limited contact with ITW or its personnel. This consisted primarily of letter requests by ITW for information as to the status of prosecution of patent applications or to execute formal papers. In 1970 Cunningham telephoned Kovac for a recommendation of patent counsel when Barr Stalfort decided to make a change. Kovac's recommendation was Owen Murray who was retained and took over prosecution of Cunningham's patent application relating to Grip-Pak I, replacing Barr Stalfort's former patent counsel. In January, 1971, Kovac decided to leave ITW, effective February 12, to practice law in Missouri. A few days before he was to leave, Cunningham and Murray attended a farewell luncheon for Kovac. On that occasion Cunningham told Kovac about his Grip-Pak I patent application. Kovac told him that if he came across any prior art concerning it he would forward it to Murray. In a letter dated February 10, 1971, Kovac called Murray's attention to two U.S. patents related to a "stretchable carrier band" and to one which concerned forming the "upper portion of the carrier into a handle structure."

During Kovac's tenure at ITW (from July, 1963, to February 12, 1971), he was promoted in 1968 to manager of its patent department. Whenever either an ITW employee or an outsider submitted an invention disclosure to ITW's patent department Kovac, as its patent attorney, would review the idea and research it against prior art patterns to ascertain if it was patentable. As manager of ITW's patent department he reviewed over 300 \invention disclosures per year and prosecuted 30 to 50 patent applications. He also was concerned with revision of ITW leases from time to time.

Both Kovac and Cunningham signed a form of employment agreement during their ITW tenures agreeing, among other things, (1) not to disclose to outsiders without prior permission "any confidential information" relating to ITW's business, either before or after their ITW employment and (2) that they thereby assign to ITW their interest or title to any invention or idea conceived by them during their ITW employment and for six months thereafter.

In March, 1971, after Kovac became associated with a St. Louis law firm, Cunningham engaged him to review the Grip-Pak I bottle carrier patent application which had been filed in the United States Patent Office. Kovac did so and advised Cunningham that it was patentable. In June, 1971, at Cunningham's request, Kovac met with him and Murray. That meeting resulted in the formation of ERC & Associates (Associates) in which Cunningham had a 52% interest and Kovac and Murray 16% each.

(The remaining 16% was allocated to a fourth person, Mr. Bergmann.)

After forming Associates in June, 1971, negotiations were conducted with various glass and bottle manufacturers, including Owens Illinois (a joint venturer with ITW in the sale of plastic can carriers), Union Carbide, Reynolds Metals and W. R. Grace. The negotiations with Owens Illinois and Union Carbide were terminated without reaching agreement.

It may be appropriate at this point to describe briefly the Grip-Pak products here involved and which ITW's suit sought to recover for itself. One is the Grip-Pak I carrier which comprises a five-sided bottomless bag, preferably of polyethylene plastic, which can be stored as a flat blank. It is designed to be opened, stretched and applied to a number of bottles or other containers, without application of heat, and is intended to provide a stable carrier and to prevent shifting of bottles in the package. Another is the Grip-Pak I applicator for applying the carriers to the containers. The Grip-Pak II can carrier is a scrap-less carrier fabricated from lay-flat, double tube plastic (tubing). It is slit so that the flattened bands can be opened into cylindrical bands for application to cans by high speed applicating machines. Both carriers and the applicator have been patented and assigned by Cunningham to G-P.

G-P was incorporated in March, 1972, and is a successor of Associates. Cunningham is president, treasurer and director and owns 60% of the stock. Kovac is also an officer and director and owns 30% of its stock.

Early in December, 1971, Kovac telephoned Beart at ITW suggesting a meeting at Cunningham's home on December 14, 1971, to determine if Beart "would be interested in seeing a disclosure of a new concept on a carrier device." Beart and ITW's Calmar Johnson attended that meeting, and signed "Confidential Disclosure Agreements." Kovac and Cunningham thereupon displayed to them a number of Grip-Pak I packages and an applicating machine which Cunningham had made. They discussed the status of their negotiations with other companies of which ITW had been aware. Beart requested that a written proposal be submitted by them to ITW. Accordingly, on January 10, 1972, G-P's proposal was forwarded to ITW. On the same day Kovac reported to Cunningham that he had received a telephone call from Beart in which Beart "suggested," after stating that there were 11 patents relating to Grip-Pak, that Cunningham and Kovac "might have breached a confidential relationship."

Kovac then arranged a meeting with Beart at ITW on February 16, 1972, prompted by Beart's "suggestion." At that meeting, after reviewing, discussing and distinguishing the Grip-Pak I invention from ITW patents and Cunningham's invention disclosure while he was at ITW, the meeting turned to the proposal forwarded to ITW in January. That proposal was rejected by ITW and Beart presented ITW's counterproposal of a $3,000

per month consulting fee to Kovak and Cunningham. That was rejected.

In May, 1972, Kovac had a meeting with Beart at Beart's home about the possibility of renewing negotiations and to arrange a future meeting to show the Grip-Pak I carrier and the Grip-Pak II can carrier, which Cunningham invented in December, 1971, and which had not been disclosed to any other company. A meeting was arranged for June 21, 1972, at ITW's offices. However, Cunningham insisted as a condition to the holding of such meeting that ITW agree to inform Kovac within a reasonable time in writing whether ITW had developed a scrap-less carrier, similar to Grip-Pak II. ·

Accordingly, Beart, for ITW, signed a document to that effect. At the June 21 meeting ITW was represented by its president, S. Cathcart, R. Rettig, vice-president of its Hi-Cone Division, and Beart. G-P was represented by Cunningham, Kovac, Murray and Mr. Popow. Samples of Grip-Pak I were presented and a sample as well as drawings of Grip-Pak II. Upon seeing the Grip-Pak II sample, Rettig said to Cunningham: "Ernie, you son-of-a-gun, that's terrific." Kovac testified that at that meeting he stated that the people present for G-P were involved in that company, and that he, Kovac, was an officer of G-P. Beart showed rigid-ring samples of ITW's efforts at a scrap-less carrier made by Jules Poupitch, a former ITW engineer, now retired.

Beart and Kovac met the following morning for breakfast and discussed the meeting of the day before and the terms of a proposal regarding Grip-Pak. In following days extensive correspondence continued between ITW's and G-P's principals, including G-P's proposal for Grip-Pak and Beart's advising G-P of certain patents relating to Grip-Pak II. After reviewing those patents Kovac wrote to Beart that none of that material, nor the Poupitch rings, "suggests or discloses the invention of Grip-Pak II."

On August 29, 1972, Cunningham and Kovac met again at ITW with Cathcart and Beart. At that meeting ITW made a written counterproposal regarding Grip-Pak I. This included payment of G-P's out-of-pocket expense, a $25,000 initial royalty payment, a minimum annual royalty of $30,000, and a reduced royalty rate after ITW paid G-P $500,000. In later correspondence G-P rejected that offer and proposed several revisions.

The last piece of correspondence between ITW and G—P was Beart's letter of November 20; 1972, to Cunningham, asking him to execute certain documents relating to a Cunningham patent previously assigned to ITW. Beart in that letter wished Cunningham a "happy Thanksgiving holiday" and added his hope "that we will get to see you once more in regard to negotiations that still pend between the companies."

On May 9, 1973, G-P displayed its Grip-Pak I and II products, at Packaging's invitation in its booth, at a packaging show at McCormick

Place. As part of that promotion Cunningham demonstrated the Grip-Pak I carrier by assembling bottles into multi-packs using applicating jaws from an ITW Model 200 applicating machine which Anheuser Busch leased from ITW. ITW sent 2 people, E. Benno, manager of ITW's Patent Department, and Ron Owen, an ITW employee, to see the Grip-Pak products.

Almost 4 years earlier (in August, 1969), Owen had submitted to ITW a "Patent Disclosure Form," briefly disclosing his concept of a multipack carrier for paper-board containers "[b]y serating [sic] and cutting of blown plastic tubing leaving uncut portions of tubing." That form shows that it was forwarded to the patent department, and above Kovac's signature (by his initials) appears a check mark which recommended "filing." Admitted in evidence is an undated memorandum from Kovac to R. Rettig, manager of ITW's Hi-Cone Division, stating that a search discloses no prior art and requests authorization to proceed with filing a patent application, "[i]f Hi-Cone Division is interested" in doing so "based upon commercial interest in the idea." No response appears in the record. Instead, the disclosure was merely filed away. Kovac testified that, although the documents were genuine and bore his signatures, he had no recollection of the incident or the idea disclosed by the invention disclosure. At the trade show on May 9, Owen, who had not previously seen the Grip-Pak product, talked to both Kovac and Cunningham. Kovac and Cunningham freely discussed their products with Owen, and Cunningham demonstrated the Grip-Pak II carrier for him, and showed him the Grip-Pak II patent drawings.

Immediately after leaving the packaging show Owen and Benno proceeded to the office of ITW's patent counsel in downtown Chicago. Beart was present at the meeting. A sample of Grip-Pak II, previously handmade by Cunningham and procured by ITW from some source other than G-P , was "available at the meeting" and was compared to the Owen disclosure of August, 1969, and "it was decided to file a patent application" on "that disclosure." On May 9, 1973, the day of the packaging show, ITW's patent counsel forwarded such application to the U.S. Patent Office. During their testimony, Owen and Beart admitted that figures 7 and 8 of the Owen patent application were not depicted in the Owen disclosure of August, 1969. They are sketches of 2 views of a plastic carrier which resembles Cunningham's Grip-Pak II carrier.

From our view of this extensive record the primary question is whether Kovac, as ITW's former lawyer, breached his fiduciary obligation to ITW, his former client. The next question would be whether Cunningham either violated any fiduciary or confidential relationship he owed ITW, or is tainted by his association with Kovac.

■■ It has long been established that an attorney has a fiduciary

relation with his client which requires him to exercise the utmost good faith in his dealings with others, and that he may not profit by any breach of such obligation. (See 4 Ill. L. & Pr. *Attorneys and Counselors* §104 (1971).) Likewise, attorneys have been frequently restrained or disqualified from attempting to represent in litigation an interest adverse to a former client (7 Am. Jur. 2d *Attorneys at Law* §159 (1963)). The latter rule need not concern us since Kovac is neither representing any client nor himself in this suit; he is represented by other counsel who are defending him in this litigation.

ITW seeks to hold Kovac liable by asserting as a legal principle that Kovac's breach of his attorney-client duty to ITW "occurred by reason of the mere fact that, after leaving ITW, he represented others adversely in matters that were substantially related to confidential information he may have acquired in representing ITW." ITW then argues that because "multi-pack carriers were the subject matter of Kovac's legal services while at ITW," as well as being the subject matter of G-P, the breach of duty by Kovac is thereby established. That is not the law.

Needless to say, this case does not concern a disciplinary proceeding involving Kovac, nor does it concern any attempt to disqualify Kovac from participation as a defendant.

We have diligently searched this record for evidence of a breach by Kovac, or by Cunningham, of fiduciary or confidential relationships to ITW. We find none. Kovac and Cunningham testified at great length at trial as to their conduct both at ITW and after leaving its employ. They and G-P produced on demand rafts of documents, including letters, copies of letters and numerous interoffice memoranda. No purpose would be served by commenting on each of the exhibits or portions of testimony.

There was only one occasion prior to the filing of this suit on which anyone from ITW even "suggested" that Kovac or Cunningham might have breached their confidential relationship. That was in January, 1972, when Kovac reported having received a telephone call from Beart, during which Beart made that suggestion. ITW concedes that at none of the numerous meetings that Kovac or Cunningham, or both, had with ITW's representatives was any such charge or suggestion ever made. Nor were any such charges or suggestions made in any of the numerous letters written by ITW to Kovac, Cunningham or G-P, or in any of ITW's interoffice memos.

■■ The trial court expressly found that "Kovac did not breach any duty he owed to plaintiff as a lawyer or as an employee." We agree. Accordingly, as to ITW's appeal, the judgment dismissing ITW's complaint, as amended, is affirmed. In view of our disposition of ITW's appeal we do not reach other issues presented by the parties.

We next consider the defendants' cross-appeal, relating to the trial court's denial of defendants' motion to tax the defendants' reasonable expenses and attorneys' fees in defending this suit against ITW. From our examination of this record and taking into account the trial judge's familiarity with this case, we are unable to say that he abused his discretion in denying that motion, except in one particular. We note that ITW served notice of the taking of a deposition of John L. William and Charles House of the Mead Corporation on June 27, 1974, in Atlanta, Georgia. To remove any obstacle thereto, Kovac had written a letter to that company releasing the Mead Corporation from a certain "confidentiality agreement" of March 8, 1974. Kovac and his attorneys appeared in Atlanta pursuant to that notice. After some colloquy, ITW's counsel "withdrew" his notice, stating he would not proceed with any depositions. When defendants' counsel sought to have the witnesses sworn ITW's counsel told the reporter that having "hired" him, he was now "firing" him. Defendants on July 12, 1974, filed a motion under Supreme Court Rule 209(a) (Ill. Rev. Stat. 1973, ch. 110A, par. 209(a)) to require ITW to pay $849.37 for reasonable expenses and attorneys' fees (itemized) for their attendance. The trial court continued that motion until the termination of trial for ruling.

■■ It is clear that ITW failed to proceed with the depositions after serving notice for their taking. We conclude that the defendants are entitled to an order directing ITW to pay defendants the sum of $849.37 for reasonable expenses and attorneys' fees incurred by defendants in attendance pursuant to ITW's notice. Therefore, the judgment entered on February 24, 1975, denying defendants' motion for reasonable expenses and attorneys' fees, is accordingly modified, and as so modified, is affirmed.

Judgment affirmed in part and modified in part.

T. J. MORAN, P. J., and DIXON, J., concur.