NICHOLAS A. KARRIS, Plaintiff-Appellant, v. WATER TOWER TRUST AND SAVINGS BANK et al., Defendants-Appellees.

First District (3rd Division)    No. 77-983

Opinion filed May 2, 1979.

Leonard M. Ring, of Chicago, for appellant Nicholas A. Karris.

Baker & McKenzie, of Chicago, for appellee First National Bank of Chicago.

James P. Connelly, of Chicago, for appellee Water Tower Trust and Savings Bank.

Richard Orlikoff and Randolph K. Blomberg, both of Chicago, for other appellees.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:
This suit was instituted on January 24, 1977, by the plaintiff, Nicholas A. Karris, on his own behalf and on behalf of all other shareholders of the Water Tower Trust and Savings Bank (Water Tower) similarly situated. Karris named as defendants the Water Tower Bank, certain individual directors and shareholders of Water Tower, the First National Bank of Chicago (First National) and the Water Tower Realty Company. In count I of the complaint Karris prayed that an agreement between Water Tower and First National for the sale of certain assets of Water Tower to First National be declared null and void. Karris further requested that a temporary restraining order, a preliminary injunction and a permanent injunction be entered prohibiting the consummation of the sales agreement and that defendants Asher, Himmel, Kostner, Mesirow and Johnson be removed as directors of Water Tower. In count II, which was based upon the same allegations that were raised in count I, Karris asked for $4,000,000 in actual damages and $5,000,000 in punitive damages. The circuit court entered an order denying Karris a temporary restraining order and a permanent injunction. The court further determined that there was no just reason to delay review of its order and this appeal ensued.

On or about February 23, 1977, Karris petitioned the court to set aside certain proxies which the management of Water Tower obtained through a solicitation to the shareholders of the bank and to enjoin a shareholders' meeting scheduled for March 1, 1977. This petition was subsequently denied. The court then heard evidence on the plaintiff's request for injunctive relief. This evidence, which is substantially uncontroverted, showed the following facts.

At the time of its incorporation in 1973 Water Tower issued 120,000 shares of stock at a stated price of $25 per share. A block of 60,750 shares, amounting to 50.625% of the initial capitalization, was purchased by one particular group of investors. This group was composed of the following individuals and entities:

| | |
|---|---|
| Robert Asher | Abner Mesirow |
| Richard Curtis | Michael Whelan |
| James Frankel | Michigan Avenue Financial Corporation |
| Ivan Himmel | |
| Howard Johnson | OPAR Corporation |
| Joseph Kostner | Lawndale Financial Corporation |

These investors acquired this stock with the aid of a $1,147,500 loan obtained through the LaSalle National Bank. Pursuant to this loan, the investors signed demand notes; however LaSalle's records indicated that the loan was for three years, due to mature on July 9, 1976. The loan was cross-collateralized so that none of the shares of Water Tower stock, which were pledged as security for the loan, would be released until the entire loan was paid. At the time of the loan, Himmel, Johnson, Mesirow and Kostner were directors of Water Tower and Frankel was the attorney. Johnson was also the chairman of the board and the chief executive officer.

The plaintiff first became a shareholder in August 1975, when he purchased approximately 7,000 shares. Subsequently, in July 1976, Karris contracted to purchase 12,650 shares owned by Curtis and 11,200 shares owned by Whelan.

Water Tower was organized in 1973 and began operations in May 1974. Since the time of its inception, the bank maintained its facilities in a building at 717 North Michigan Avenue in Chicago. This location is on the southeast corner of Michigan Avenue and Superior Street. The building is owned by the National Sporting Goods Association. The bank's facilities are situated on the first and second floor of the Michigan-Superior building with the first floor space fronting on Superior Street. The Thayer-McNeil Shoe Company also rents space in the building and this space fronts on Michigan Avenue.

In a letter dated October 12, 1973, G. Marvin Shutt, the executive director of the sporting goods association, indicated that when the lease

of Thayer-McNeil terminated, the Water Tower Bank would have a right of first refusal on that space. This lease is scheduled to expire in 1982.

On February 1, 1975, Water Tower purchased a 99-year leasehold interest in the land and building at 677-79 North Michigan Avenue. The building, which is a four-story commercial structure, is situated on the southeast corner of Michigan Avenue and Huron Street. Under the leasehold agreement, Water Tower paid $315,000 in cash and agreed to pay an annual ground rent. This rent escalates in graduated steps from $75,000 for each of the first two years of the leasehold to $130,000 for each of the final 20 years.

Water Tower transferred the lease to the Water Tower Realty Company, a wholly owned subsidiary of Water Tower, which was formed in March 1975 and operated the building as income property. The principal tenants in the building were Joseph's Salon Shoes, Inc., and Celano, Inc. The lease in effect at the time of trial for Joseph's Shoes was to terminate February 1, 1982. After February 1, 1979, Water Tower would have the right to cancel the lease upon six months notice. Joseph's paid a base rent of $90,000 per year for the space in the basement and first floor of the building, plus $6,000 per year for the common areas. In addition, they paid a percentage rental of 7% of their gross sales over $1,285,714. Celano's lease was to expire January 31, 1977, but they held an option to renew for four years. At the time of trial they paid a base rent of $2500 per year plus 6 percent of their gross sales in excess of $300,000. Water Tower's records showed that for the 11-month period ending December 31, 1975, there was a loss of $14,791 for the operation of the leasehold, $10,116.10 of which was attributable to depreciation.

In the spring of 1975, LaSalle Bank classified the loan to Curtis and Whelan as substandard. At the end of the year the loan to Curtis, Whelan and Kostner was classified as Risk 3, a denomination which indicated that the loan was considered high risk. In February 1976, LaSalle told Kostner that it would like the loan "moved" or refinanced through a different bank and, in April 1976, indicated the same desire to Curtis. The bank told the investors, in June 1976, that it wanted to have the loan repaid by July 9, 1976. Early that fall, Frankel and Kostner approached a number of Chicago banks in an attempt to obtain new financing. Only Continental Bank offered the investors a loan but the investors considered that the terms of the loan were unacceptable.

At approximately the same time, First National initiated efforts to locate a satisfactory location for a secondary banking facility, as authorized by section 5(15) of the Illinois Banking Act (Ill. Rev. Stat. 1977, ch. 16½, par. 105(15)). This provision, which became effective October 1, 1976, in part permits a bank to establish a secondary facility within a radius of 3500 yards of the main banking premises providing it is not

placed within 600 feet of an existing premises of another bank. This 600-feet limitation does not apply if the facility is closer to the main location of the establishing bank than to the other bank, or if the other bank grants an irrevocable consent to have the secondary facility within 600 feet.

James Cassin, senior vice-president and head of the Personal Banking Department at First National, was responsible for locating the site. By August 1976 First National had reduced the possible choices to three locations, including one on North Michigan Avenue. The testimony of Cassin, Pamela Bruce, an associate of Cassin, and Johnson varies to a degree as to the precise occurrences of the next several months.

Cassin testified that he first met with Johnson on August 18, 1976, at which time he disclosed First National's interest in obtaining Water Tower's consent to place a banking facility within 600 feet of Water Tower. At that meeting Johnson indicated a willingness to continue discussions on this matter. Johnson also stated at that meeting that there was a possibility that First National could buy all or a part of Water Tower. Cassin testified that he dismissed the possibility of such a purchase by First National because of antitrust implications, but he agreed to search for prospective purchasers. A week or two later, Cassin did locate a possible purchasing group, but the deal was never consummated.

Cassin stated that throughout September a series of meetings were held with Water Tower. The discussions turned to the sale of the consent along with the leasehold interest Water Tower held in the Michigan-Huron building. In late September or early October Cassin made an offer of $1,000,000 for both the consent and the leasehold.

It was also during these frequent contacts that Johnson asked whether First National would be interested in making a loan to the investing group involved in the LaSalle loan. Cassin testified that he indicated to Johnson that the bank was always interested in lending in credit-worthy situations. He further indicated to Johnson that this was a sensitive situation and that it would have to be handled separately from the sale of the consent. However, he told Johnson that if he would bring in the list of investors, he would put Johnson in touch with the proper unit at First National. Johnson subsequently forwarded the financial statements of the individual investors to Cassin. Cassin gave these documents to Joseph Migely who was the head of Division R, the unit responsible for handling loans to professionals and executives. Organizationally, this division was within the department headed by Cassin.

The Board of Directors of Water Tower held a special meeting on October 25, 1976, to consider the offer of $1,000,000 for the sale of both the consent and the leasehold. At that time the offer was rejected. Following that meeting, Cassin and Johnson discussed the possibility of

the sale of the consent without the leasehold. Cassin subsequently made an offer of $425,000 for the consent. He testified that a subsidiary of the bank had made a valuation of the leasehold property which established a high of $1,451,000 and a medium of $575,000 and a low of $420,000. In arriving at the offered price of $425,000 for the consent, Cassin selected the medium value for the leasehold and subtracted it from the original offer of $1,000,000. The Water Tower board subsequently voted to accept the offer. Following the filing of a suit by Karris, on November 22, 1976, negotiations on the sale were suspended. Talks resumed in December and an agreement was finally reached to sell both the consent and the leasehold for $1,100,000.

Johnson testified that he first met with Bruce and Cassin on August 18, 1976, at which time Cassin probed the possibility of obtaining the consent from Water Tower. Johnson indicated that he would be interested in discussing it further. However, he denied that, at this meeting, he stated that the bank was looking for a buyer.

Johnson stated that through the remainder of August and September he had several additional meetings with Cassin. At one point he claims that First National made an offer of approximately $250,000 or $280,000 for the sale of the consent. He also stated that the discussions evolved into a consideration of the sale of the leasehold interest along with the consent. First National then made an offer of $750,000 to $800,000 for the sale of both assets. This offer was later raised to $1,000,000.

Johnson had not taken the original proposals to the board. However, at a special board meeting on October 25, 1977, the board considered the $1,000,000 offer. Because of concern over the legal status of their right of first refusal on the Thayer-McNeil space, the board declined First National's offer. However, the board approved a counteroffer to First National of $425,000 for the sale of the consent alone. Johnson testified that the price was selected "because we couldn't get $500,000." He claimed that an offer of $500,000 for the sale of the consent was specifically refused during the negotiations. First National subsequently agreed to enter into a contract to purchase the consent for $425,000 and, at a special meeting held on November 3, 1976, the bank's board of directors passed a resolution authorizing the consummation of the contract.

On November 22, 1976, Karris filed a lawsuit to enjoin the sale of the consent and, as a consequence, the contract was never signed. In mid-December, negotiations resumed for the sale of both the consent and the leasehold for an amount in excess of $1,000,000. Water Tower sought, from the sporting goods association, assurances that the bank held a contractual right of first refusal on the Thayer-McNeil space. Frankel and Johnson met with Shutt and then, in a letter to Shutt dated December 17, 1976, Johnson outlined his understanding of the agreement on the lease of

the Thayer-McNeil space. Johnson, in the letter, noted that in a letter dated October 12, 1973, the association had indicated that Water Tower had been granted a right of first refusal. The letter also contained the following statement:

"Some of the Directors expressed concern regarding the informal nature of this commitment and raised questions concerning its legal validity. We were greatly heartened and reassured by your explaining to us that this entire matter had been thoroughly discussed and agreed upon by your Board of Directors and by the fact that you were acting in your official capacity as Secretary of the Association as well as its Executive Director, and that therefore, this letter constituted a legally valid and binding commitment."

In response, by letter dated December 20, 1976, Shutt commented that Johnson's letter "outlines the situation exactly as it exists." Subsequently, an agreement was reached between First National and Water Tower to sell both the consent and the leasehold for $1,100,000 and, on January 20, 1977, the contract for sale was signed.

Pamela Ann Bruce testified essentially the same as Johnson and Cassin. However, she stated that at their second meeting they discussed a sale of both the consent and the leasehold and at that time First National made an offer of $1,000,000 for both assets. She recalled that there were several more meetings between that time and the October 25 directors' meeting. Following the filing of the Karris suit on November 22, 1976, Bruce wrote a memorandum commenting upon the implications of the suit and she stated that if First National became a party to the suit and if the bank was asked to explain how it arrived at the market value of $425,000 for the consent "the situation would be most precarious." She explained that by this comment she was referring to the fact that the calculation was made so simply, merely deducting $575,000 (the median value of the leasehold) from $1,000,000 (the original offer for the leasehold and the consent).

While the negotiations for the sale of the consent and the leasehold were proceeding, First National was processing the loan applications for the investing group. Migely testified that he received copies of the financial statements of the individual investors in September 1976. After reviewing these statements, he advised Cassin that he thought there was a way of lending the money. Cassin told him to pursue the loan.

At Migely's direction, Phillip O'Neill, an employee in Division R, checked the credit-worthiness of the individual investors. O'Neill found that Waxman and Himmel were not acceptable. Sometime during the first or second week in November, O'Neill asked Karris to guarantee the

loan for Waxman and Karris agreed. A new investor to take Himmel's place was also found. At this time O'Neill also requested that documentation be started.

O'Neill, Migely and a third individual from the legal department at First National met with Frankel sometime during the latter part of November or early December. At that time Migely testified the loan was not made. Subsequently, Frankel told First National to hold up on processing the loan and it was never finalized. However, Karris testified that Frankel had told him that the loan had been approved. In addition, Hill Hammock, of LaSalle Bank, received information from Frankel, in November, that the investors had a "verbal commitment" from a major Chicago bank which would provide them the ability to repay the LaSalle loan.

The parties also presented expert witnesses who testified as to the value of the leasehold and the consent. Thomas J. McCracken, an attorney and chairman of the Board of Directors of the Oak Trust and Savings Bank and the First National Bank of West Chicago, testified for the plaintiff as to the value of the consent. McCracken stated that he was not aware of any prior sale of such a consent. It was his opinion that its value should be determined by analogizing it to the differential between the sale of a hypothetical bank at the Michigan-Huron location and the possibility of establishing a new bank at that location. In making these calculations, he assumed several facts. First, he assumed that to obtain a charter for a new bank from the Commissioner of Banks, a capital outlay of $3,000,000 would be necessary. Secondly, he assumed that, after taxes, the profits of a mature bank would be ¾ of 1 percent of its assets. Third, he made the assumption that a bank operating at the Michigan and Huron location would reach maturity in three years. Maturity, he explained, was "the point where [the bank] operates as effectively as the average bank in its federal reserve district." Finally, he assumed that a bank would recoup its initial losses by the end of its third year of existence.

McCracken then explained that a bank is usually sold for a multiple of its net book value, a figure which he referred to as a premium. The premium, he explained, was made up of two elements: the "present value of the compounded earnings during the adolescence of a hypothetical new bank" and "the monopoly value of securing the permission to operate in that location." In the hypothetical instance presented here, he assumed a premium of 100% of net book value. McCracken testified that he had previously been involved in five prior sales of banks and that in each of those instances, the premium multiple had been 50%. However, he attributed the higher premium here to the fact that the bank was located on the near north side of Chicago. Thus, he took the premium value of

$3,000,000. He determined the present value of the compounded earnings to be $1,109,000. He subtracted that from the $3,000,000 premium value, thereby leaving a value of the consent of $1,891,000.

On cross-examination McCracken testified that the Oak Bank, which was also located on the near north side of Chicago did not reach maturity for five or six years. He also acknowledged that the Water Tower Bank did not reach maturity within three years. He further agreed that the Oak Bank had a return of only .15% of its assets in its first year of operation, instead of the .75% he assumed in his calculations.

Donald Engel, an expert real estate appraiser, testified that he appraised the property at Michigan Avenue and Huron Street for the plaintiff. Engel determined that the value of the land was $1,370,000. He also estimated the value of the leased fee interest (the right of the lessor to receive the rent as contracted for plus the reversionary interest at the time the lease expires) at $1,140,000. Engel then made appraisals of the value of the building using the cost, economic and market approaches.

Under the cost approach, Engel sought to determine the cost of reproducing the building at the present time with adjustments for depreciation and for the fact that the property was not owned in fee. After determining the cost of reconstruction, he made certain adjustments for obsolescence and for site improvements. To the resulting figure, he added back the value of the land and subtracted the value of the leased fee interest and obtained a final estimate of $1,420,000 under the cost approach.

By the economic method, Engel attempted to determine the value of the leasehold by establishing the expected income from the property. He estimated that the annual net income from the property would be $258,984. He capitalized this income at a rate of 9.6%, producing a value of $2,700,000. From this figure, Engel deducted the value of the leased fee interest and concluded that, under the economic approach, the leasehold was worth $1,560,000.

Under the market approach Engel attempted to compare the prices of the sales of similar property to estimate the value of the leasehold. Under this analysis he concluded that the property was worth $1,540,000. However, he agreed that this method was not as persuasive as the others because most of the comparable sales were for full fee interests and that the highest and best use was for a 16-story building.

Weighing the relative strength and weaknesses of each of these methods, Engel concluded that the value of the leasehold interest was $1,500,000.

Howard Zimmerman, also an expert real estate appraiser, testified for the defendants as to the value of the leasehold. Like Engel, Zimmerman first estimated the value of the land and of the leased fee

interest. He concluded that the land without any structure was worth $1,410,000 and the leased fee had a value of $1,066,000. The present building was not using the land at its highest and best use. The best use of the property, he contended, would be a 16-story building. He testified that the owner of the leasehold might have some benefit of the $344,000 differential between the value of the land absent any structure and the leased fee interest if he tore the present building down and rebuilt a 16-story building on the property. However, he also noted that some of the benefits would be lost because of the cost of demolition. Also, like Engel, his opinion of the value of the leasehold was based upon the correlation of estimates derived from the cost, economic and market approaches.

Under the cost approach, Zimmerman first arrived at an estimate for the replacement cost. Then after deducting for depreciation, Zimmerman concluded that the building was worth $783,000. Unlike Engel, Zimmerman did not add the value of the land to his estimate of the value of the leasehold.

Under the economic approach, Zimmerman estimated the value of the gross annual income for the building at $270,774. Then, after adjusting for certain expenses amounting to $196,036, or a net annual income of $74,738 and capitalizing at a rate of 10.28%, he arrived at a value of $730,000. With respect to the market approach, Zimmerman concluded that none of the recent sales of property in the vicinity of the Michigan-Huron building were comparable. Therefore, he determined that a market approach would not be appropriate in this case. Then, considering all of the factors in his analysis, Zimmerman concluded that the value of the leasehold interest was $730,000.

Karris offered Sheldon Mandel, the president of National Wrecking Company, as a rebuttal witness. Mandel's testimony was not admitted into evidence; however, through an offer of proof he stated his opinion that the cost of demolishing the Michigan-Huron building would be $49,000 if it was necessary to fill in the basement or $34,000 if it was not necessary to fill in the basement.

In seeking a reversal of the circuit court's judgment, Karris makes several arguments. First, he claims that the resolutions authorizing the sale of the leasehold and the consent are void because they were passed with the aid of the votes of interested directors. Second, he asserts that the individual directors, along with Frankel as attorney for the bank, breached their fiduciary obligations by dealing with corporate assets for their own personal benefit. Third, Karris challenges the trial court's denial of his petition to set aside the proxies obtained via the February 17, 1977, solicitation. Finally, he objects to the trial court's exclusion of certain rebuttal testimony. The individual defendants assert that Karris is not an adequate representative to maintain this derivative action and that he

failed to exhaust his corporate remedies. It will be these threshold issues which we will consider first.

## I

The defendants' contention that Karris failed to exhaust his corporate remedies is based upon Karris' failure to take part in the March 1, 1977, shareholders' ratification meeting. The defendant directors note that apart from the shares they controlled, there existed sufficient shareholders to defeat the ratification of the sale. Thus, Karris had an opportunity to solicit proxies for his own position but failed to pursue this opportunity. This failure, the defendants urge, estops the plaintiff from now challenging the sale. In support of their position, they cite *Katzin v. Nabco Liquidating Co.* (1944), 323 Ill. App. 286, 55 N.E.2d 409 (abstract). ■■ ■ It has long been held that, as a prerequisite to a derivative action against a corporate officer or director, a minority shareholder must show either that he made a demand upon the corporation to enforce the corporate right and that such demand was refused, or that a demand would have been futile. (*Babcock v. Farwell* (1910), 245 Ill. 14, 91 N.E. 683; *Robb v. Eastgate Hotel, Inc.* (1952), 347 Ill. App. 261, 106 N.E.2d 848; *Goldberg v. Ball* (1940), 305 Ill. App. 273, 27 N.E.2d 575.) Moreover, a shareholder may not challenge an action by the officers or directors where he had previously given either express or implied consent to the action. (*Schipper v. Block & Kuhl Co.* (1936), 283 Ill. App. 486; 13 W. Fletcher, Cyclopedia Corporations §§5862, 5863 (perm. ed. 1970).) However, we believe that neither the demand requirement nor the estoppel doctrine precludes Karris' suit.

■■ In those instances where the courts have denied a shareholder the right to maintain a derivative action because of a failure to make a demand upon the corporation to enforce the right on its own, they have done so because the plaintiff failed to communicate his opposition to the board of directors; no Illinois case has precluded a derivative action for the failure to make a demand before the shareholders. The defendants do not claim that Karris was obliged to make a demand upon the Water Tower board; rather, they argue that Karris was obliged to take part in the shareholders' ratification meeting. Moreover, the facts do not support the contention that Karris effectively consented to the sale. Karris first became aware of the proposed sale sometime around November 18, 1976. Within the next several days, he personally voiced his opposition to the sale to Johnson and transmitted telegrams and letters to all of the Water Tower directors. On November 22, 1976, he filed a suit seeking a declaratory judgment that the sale, as approved November 3, 1976, by the board, was null and void. On January 17, 1977, the board authorized the sale of the consent and the leasehold interest for an amount of $1,100,000. Karris filed

the present suit within a week, seeking to enjoin the sale. It was after the filing of this suit that the proxy solicitation was made. Rather than showing a pattern of assent to the sale of the assets, the facts reveal Karris' immediate and consistent opposition. Therefore, we hold that Karris should not be estopped from prosecuting this action.

## II

The individual defendants also argue that Karris should be prohibited from bringing this action since Karris does not adequately represent the other shareholders. They argue that Karris' motivation in bringing suit was to promote his desire to gain control of the management of the bank. The evidence, the defendants argue, demonstrates that Karris continually sought to prevent the original investors from obtaining refinancing of their LaSalle loan. Moreover, they note that Karris is a member of a partnership which obtained a loan through Water Tower. Thus, the individual defendants argue that Karris' interests are in direct conflict with the interests of the other shareholders.

The defendants' position is premised upon the view that the prerequisite of adequate representation by the plaintiff which is applicable in the area of class action litigation is equally applicable in the present case. Yet none of the cases cited by the defendants present a situation where the plaintiff brought a derivative action. (See, for example, *Newberry Library v. Board of Education* (1944), 387 Ill. 85, 55 N.E.2d 147; *Dailey v. Sunset Hills Trust Estate* (1975), 30 Ill. App. 3d 121, 332 N.E.2d 158; *Reardon v. Ford Motor Co.* (1972), 7 Ill. App. 3d 338, 287 N.E.2d 519.) It is unnecessary for us to determine, however, whether this requirement of adequate representation applies to derivative actions because even assuming that such a requirement exists, we are convinced that Karris has been shown to be an adequate representative.

The essence of Karris' suit is that several directors and officers of the bank agreed to sell certain assets at an unreasonably low price in order to further their own personal interests. We fail to see how Karris' alleged concern with the composition of the management of Water Tower detracts from his abilities to vigorously pursue this claim. Since the proffered conflict of interest does not significantly impair his ability to represent the other shareholders, Karris should not be prohibited from prosecuting his claim.

## III

In seeking reversal of the circuit court's order, Karris first argues that the resolutions authorizing the sale are void since there was no quorum during the board meetings at which these resolutions were passed. The essence of his argument is that none of the directors who were part of the

group seeking the loan from First National could be counted towards the quorum and that without these individuals a quorum was not present. Absent a quorum, Karris reasons the resolutions were void.

■■ Water Tower had seven directors and, by law, a quorum is composed of at least a majority of the directors. (Section 16(6), Illinois Banking Act, Ill. Rev. Stat. 1977, ch. 16½, par. 116(6).) In Illinois, a director who has a personal interest in a matter under consideration is disqualified to vote upon the matter and thus may not be counted towards the quorum. (*Elward v. Peabody Coal Co.* (1956), 9 Ill. App. 2d 234, 132 N.E.2d 549; *Federal Life Insurance Co. v. Griffin* (1912), 173 Ill. App. 5.) The record shows that at none of the meetings at which resolutions which concerned the sale of the consent and leasehold were passed were there four directors present who were not involved with the LaSalle loan. Thus, Karris is correct in his assertion that there was no quorum if it could be said that the directors who benefited from the LaSalle loan were interested directors.

The question of whether those directors were interested in the sale is a factual one. Thus, in reviewing the judgment of the trial court, we are limited to a determination of whether the judgment is contrary to the manifest weight of the evidence. *Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518; *City of Chicago v. Commonwealth Edison Co.* (1974), 24 Ill. App. 3d 624, 321 N.E.2d 412.

A review of the record shows that Karris has produced no direct evidence of a connection between the loan and the sale of the leasehold and the consent. Karris' case relies upon the inferences to be drawn from the simultaneous negotiations for both the sale and the loan and from the alleged discrepancy between the actual value of the assets and their sale price. However, the officials of First National responsible for processing the loan all testified that the matters were never interrelated. Migely, who had the authority to grant the loan, did not take part in the sale negotiations. In fact, while he knew that First National was involved with Water Tower in some other capacity, he did not know of the existence of those negotiations. Organizationally, the division run by Migely was located within Cassin's department; however, there is nothing in the record to indicate that Cassin ever pressured Migely to apprgve the loan. There is also nothing to positively establish that the loan was ever approved. While it does appear that the First National did work on the processing of the application, there is no positive proof that the loan was finally authorized.

The expert testimony with respect to Karris' contention that the assets sold were worth substantially more than the amount which the bank received lends little support to Karris' position. The most significant difference between the appraisal by the plaintiff's expert and the appraisal

by the defendants' expert rested with the fact that the defendants' expert did not believe that the value of the land should be considered in the valuation of the leasehold interest. The witnesses explained their reasons for their judgment and it was the duty of the trial court to assess that testimony. Since this determination was a matter of assessing the credibility of the witness, we will defer to the judgment of the trial court. As to McCracken's testimony on the value of the consent, we note that the record supports a consideration that his conclusions were speculative.

■■ After reviewing the evidence, we believe that the conclusion that there was no connection between the sale of the Water Tower assets (consent and the leasehold) and the loan is not contrary to the manifest weight of the evidence. Absent the establishment of such a connection, it cannot be said that the directors who were seeking the loan were interested in the transaction and therefore were disqualified to vote on the resolutions concerning the sale. Therefore, we hold that a quorum was present when the resolutions were passed authorizing the sale of the consent and the leasehold.

## IV

Karris next argues that even assuming the resolutions authorizing the sale were not void, the individual defendants failed to discharge their fiduciary duties. Karris reasons that the defendants who were directors of Water Tower as well as Frankel, as attorney for the bank, were fiduciaries. In this capacity, they owed the utmost good faith and loyalty in the management of the affairs of the corporation. This duty restrains the corporate directors from using their position to further their own personal gain at the expense of the bank's interests. Moreover, where the discharge of this duty by a fiduciary is challenged, the law imposes the burden upon the fiduciary to show his fidelity and utmost good faith in his dealings. Here, Karris contends, individual defendants have failed to demonstrate this good faith and loyalty in approving the sale of the consent and leasehold.

■ We agree with Karris that the directors stood in a fiduciary relationship with Water Tower and its shareholders. (*Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 166 N.E.2d 793; *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262.) We also agree that the duties imposed upon the directors as fiduciaries require them to manage the corporation with the utmost good faith and loyalty, thereby prohibiting them from enhancing their own personal interests at the expense of the corporate interests. (*Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, 337 N.E.2d 471.) We further recognize that where the discharge of this duty by a fiduciary is challenged, "courts will scrutinize such transactions with

greater severity, and the duty is upon the beneficiaries to vindicate the bargain from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect." (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 102, 160 N.E.2d 783.) However, where a plaintiff asserts that a fiduciary breached his duty of loyalty by profiting in a transaction involving the one to which he owed the duty, it is incumbent upon the plaintiff to first establish that the fiduciary, in fact, profited from the transaction. (See *Brown v. Commercial National Bank* (1968), 94 Ill. App. 2d 273, 237 N.E.2d 567, *aff'd* (1969), 42 Ill. 2d 365, 247 N.E.2d 894, *cert. denied* (1969), 396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436.) Since, as we previously determined, Karris failed to demonstrate a connection between the sale of the consent and the leasehold and the loan application, we agree with the trial court that there has been no breach of a fiduciary duty.

Karris also argues that Frankel, as the attorney for Water Tower, also owed a fiduciary duty to Water Tower and that he breached this duty. We agree with Karris that an attorney stands in a fiduciary relationship with his corporate client. (*Illinois Tool Works, Inc. v. Kovac* (1976), 43 Ill. App. 3d 789, 357 N.E.2d 639; *Phillips Construction Co. v. Muscarello* (1976), 42 Ill. App. 3d 151, 355 N.E.2d 567.) Frankel agrees with this theory but contends that there was no breach of this duty and that the plaintiff lacked standing to bring suit since the duty was not owed directly to him.

■■ We find no problem with Karris' attempt to recover Frankel's alleged breach of duty, since this suit was a derivative action. In a derivative action suit, the plaintiff asserts the right of the corporation. (*Shlensky v. South Parkway.*) In *Bevelheimer v. Gierach* (1975), 33 Ill. App. 3d 988, 339 N.E.2d 299, the case upon which Frankel relies, it is clear that the individual plaintiff was denied recovery upon his claims as an individual. However, even though we believe that Karris may raise the claim, we must reject his argument for the same reasons that we refused to find that the individual defendants did not breach any fiduciary duty.

## V

Karris also contests the trial court's denial of his petition to set aside the proxies solicited by Water Tower for the March 1, 1977, meeting. In petitioning the court to enjoin the voting of the proxies, Karris contended that the material submitted to the shareholders in soliciting the proxies contained false and misleading statements. On appeal, Karris argues that the court erred in refusing to enter the injunctions. First National counters with the argument that the plaintiff has failed to perfect his appeal as to this issue because his notice of appeal did not specify that he sought review of the order denying the petition to set aside the proxies. In addition, First National contends that Karris is estopped from contesting

the shareholders' vote since he failed to avail himself of the opportunity to mail his own solicitations to the shareholders or to even attend the meeting to vote the shares he controlled. The individual defendants raise the additional argument that the question of the validity of the proxies was never properly raised in the suit before the trial court.

We first consider the question of whether Karris has properly perfected his appeal on the issue of the proxies. The record shows that on April 6, 1977, the trial court announced its judgment denying Karris a preliminary and permanent injunction. At the same time, Karris orally renewed his motion to set aside the vote on the proxy, noting that he wished to preserve the record as to this issue. This motion was denied. Separate orders relating to these two matters were entered into the record on April 7, 1977. Karris' notice of appeal, filed May 2, 1977, read, in pertinent part as follows:

> "* * * Nicholas A. Karris * * * appeals * * * from the order entered by the Circuit Court of Cook County on April 7, 1977 wherein the Court denied Plaintiff's Complaint and Petition for a temporary restraining order and a permanent injunction.
>
> Plaintiff prays that the said judgment entered on April 7, 1977, in favor of defendants and against the plaintiff, NICHOLAS A. KARRIS, be reversed."

■■ ■ Supreme Court Rule 303 (c)(2) requires that the notice of appeal "specify the judgment or part thereof appealed from and the relief sought from the reviewing court." (Ill. Rev. Stat. 1977, ch. 110A, par. 303(c)(2).) While this requirement is considered to be jurisdictional, it is also recognized that if the deficiency relates to the form of notice and not to its substance, the jurisdiction of the appellate court will, nonetheless, attach. (*Department of Transportation v. Galley* (1973), 12 Ill. App. 3d 1072, 299 N.E.2d 810.) In *Klavine v. Hair* (1975), 29 Ill. App. 3d 483, 331 N.E.2d 355, the plaintiff, in his notice of appeal, sought review "of and from the Final Judgment entered on August 21, 1974." The record showed the final judgment was entered on that day with the entry of two orders: one denying the plaintiff's post-trial motion challenging the jury's verdict in favor of one defendant and the other granting summary judgment in favor of a second defendant. The appellate court concluded that insofar as the two orders disposed of the case in the trial court, the notice of appeal was sufficient under the circumstances. In *Department of Transportation v. Galley*, the appellate court determined that a notice of appeal filed in an eminent domain proceeding to be sufficient even though it failed to specify one particular tract of land involved in the action. The notice specifically referred to the judgment of August 5, 1971, but mentioned only two of the three tracts involved in the proceeding. The appellee claimed that the appellant failed to perfect an appeal as to that

tract which was not specified in the notice of appeal. The court first noted that the order entered by the trial court also " 'mis-described' the tract numbers, but there was no doubt in the minds of the defendants or anyone else that the order entered judgment * * * as to each respective tract." Moreover, the court concluded that the deficiency was one of form rather than substance, and stated:

> "Considered as a whole [the notice of appeal] fairly and adequately sets out the judgment complained of and the relief sought. The defendants were fully apprised of the nature of the appeal, and they were fully aware that a review was sought of the entire judgment relating to defendant's property and not just the two lesser portions thereof. Nor have defendants been prejudiced in any way. To the contrary, it is they who seek an unfair advantage on purely technical grounds." 12 Ill. App. 3d 1072, 1076.

Under the circumstances presented in this case, we likewise believe that the defendants have been "fairly and adequately notified of the judgment complained of and the relief sought." Karris specifically renewed his motion to set aside the proxies following the close of the evidence and the court dealt with that motion at the same time it disposed of the merits of the plaintiff's request for injunctive relief. The orders relating to both of those matters were entered at the same time; they were part of the final disposition of the issues. Thus, in praying for reversal of "said judgment entered on April 7, 1977," we think that the defendants were on sufficient notice of Karris' desire to have that issue reviewed as well as the denial of the petition for a temporary restraining order and a permanent injunction, and thus find that we have jurisdiction over both issues.

■■ First National's argument that Karris is estopped from challenging the proxy solicitation is based upon Karris' failure to take part in the solicitation or in the shareholders' meeting. This argument is, in essence, the same one raised by the individual defendants with respect to the claim that Karris failed to exhaust his corporate remedies. For the same reasons cited above with respect to the exhaustion argument, we hold that Karris is not estopped from now contesting the proxy solicitation.

Finally, the individual defendants argue that the question of the proxy solicitation is not an issue on appeal because that question was never properly raised before the trial court. They note that the injunction involved events which took place after the original complaint was filed by the plaintiff and that the complaint contained no prayer for an injunction against the proxy solicitation. The defendants contend that the request amounted to a separate lawsuit and that instead of a separate complaint which was necessary to institute such a lawsuit, the plaintiff merely filed a "petition" for injunctive relief. The defendants argue that because this issue was not subjected to the requirement of a formal complaint, they

had no opportunity to file responsive pleadings so as to "frame" the issue.

We find that we do not need to reach the merits of this argument. There is no indication in the record on appeal that the defendants ever voiced an objection to the sufficiency and form of the plaintiff's request for an injunction before the trial court. Objections as to the form and sufficiency of both pleadings (section 42(3) of the Civil Practice Act, Ill. Rev. Stat. 1977, ch. 110, par. 42(3)), and motions (*Chimerofsky v. School District No. 63* (1970), 121 Ill. App. 2d 371, 257 N.E.2d 480; *Zanbetiz v. Trans World Airlines, Inc.* (1966), 72 Ill. App. 2d 192, 219 N.E.2d 98) must be raised before the trial court or be waived. Since the defendants failed to present their objections before the circuit court, where any deficiency may have been corrected, we decline to review this argument.

● 12 Considering now the merits of Karris' claim, we hold that the trial court did not err in refusing to void the proxies obtained through the February 17, 1977, solicitation. While a court may enjoin the use of proxies which were procured through the use of fraudulent and deceptive solicitations (*Lonergan v. Crucible Steel Co.* (1967), 37 Ill. 2d 599, 229 N.E.2d 536), we do not believe that the statements of which Karris complains are so false or misleading the court erred in failing to take such action here.

The majority of the assertions which Karris contests are allegedly fraudulent are shown below:

1. that "[t]he sale price of $1,100,000 for the leasehold and consent is fair and adequate * * *";

2. that the bank has "consistently lost money in operating the leasehold building since the date of [its] acquisition";

3. that the sale will strengthen the financial position of Water Tower and that despite the presence of First National in the area, Water Tower will continue to "obtain [its] fair share of the market";

4. that the defendant directors have filed answers to the suit, denying any conflict of interest or breach of fiduciary duties;

5. that Karris was notified of the offer of the consent, alone, for $425,000 by the delivery of the resolution, but reference to the fact that the offer had already been accepted was deleted;

6. that the discussions by the individual directors were "on normal business terms and were conducted independent of the discussions of the sale of the consent";

7. that at the time that the final sales contract was finalized with First National "no loans or pending applications for loans" existed;

8. that the individual defendant directors "notified" First National "[p]rior to the sale of the leasehold interest with the consent" that they no longer wished to have the loan.

While these statements may be incompatible with Karris' version of the

defendant directors' activities, we have already concluded that Karris' interpretation is not supported by the record. Therefore, we cannot say that these statements amount to substantial misrepresentations.

Karris also complains that in informing the shareholders of the present suit, the bank distorted the nature of the litigation by failing to indicate that it was a derivative action and by emphasizing the fact that Karris was seeking damages. We find this argument to be unmeritorious. The record shows that in its solicitation the directors accurately and completely described the basis of Karris' complaint and the nature of the relief requested. Karris clearly sought damages as well as injunctive relief and therefore cannot complain that the shareholders were informed of this fact. While the statement included no reference to the derivative nature of Karris' action, we are convinced that this omission is not material. The disclosure that Karris' suit was derivative would, we believe, have little impact upon a shareholder's decision on whether to tender his proxy to the management.

The final statement of which Karris complains related to the directors' characterization of the agreement between the bank and the Sporting Goods Association. The statement read as follows:

> "In December 1976 * * * we obtained contractual rights to the first floor space with frontage on Michigan Avenue, effective upon the termination of the present tenant. * * * Since this [ground floor space on Michigan Avenue] has been assured, the most important reason for the acquisition of the said building has been obviated."

Karris asserts that the statement was false and misleading in that it conveyed the impression that Water Tower had a lease or a firm option on the space when in fact it only had a right of first refusal. While the use of the term "contractual right" may be slightly overbroad in terms of characterizing the bank's rights, nonetheless, we do not believe it seriously misrepresented the bank's position. The record clearly shows that in his letter to Shutt, on December 17, 1976, Johnson outlined the situation as far as the Water Tower board understood it. In that letter he referred to the earlier letter of October 12, 1973, as constituting "a legally valid and binding commitment." In reply, Shutt stated that Johnson's letter of December 17 "outlines the situation exactly as it exists." While we do not determine whether a valid contract exists, we believe that the bank clearly held a right of first refusal on the space and that that fact was indicated in the proxy statement.

## VI

The last issue which we must address is whether the court erred in not admitting the rebuttal testimony of Mandel on the cost of demolishing

the Michigan-Huron Building. Karris contends that since such evidence would have a serious impeaching effect upon Zimmerman's appraisal, the trial court abused its discretion in failing to admit this testimony. He further argues that since this testimony was included in the record under an offer of proof, this court should consider this evidence.

As Karris recognizes, the admissibility of rebuttal testimony lies within the discretion of the trial court. (*Rodriguez v. City of Chicago* (1974), 21 Ill. App. 3d 623, 316 N.E.2d 88.) Karris seeks to establish the relevancy and materiality of Mandel's testimony and the result that it would have on Zimmerman's testimony on the conditions under which the holder of a leasehold interest would realize the benefits from the use of the property at its highest and best use. Karris points to the fact that under Zimmerman's valuation, there exists a $344,000 differential between the value of the "leased fee" interest and the value of the land. This differential, Zimmerman stated, was based upon the fact that the land was valued as if it were free and clear of any structures and that, in this instance, the land was not being used at its highest and best use. During cross-examination Zimmerman testified that the holder of a leasehold interest would "have some of the benefits of this thing" if he would demolish the existing building and reconstruct a 16-story building on the site. However, Zimmerman further noted that "some of the benefits would have been lost in the cost of demolition of the existing structure if they are not recoupable." Thus, according to Karris Mandel's testimony was relevant and material since it would show that the cost of demolition would be mimimal in comparison to the increase in the value of the leasehold if the land was converted to its highest and best use.

The record further indicates, however, that Zimmerman's conclusion that this increase in value is not a proper factor to consider since the land "is not free and clear at this point, but it is encumbered with an improvement" and that it is "the limitations of this improvement [which] indicates how much net income can be generated by the total property." The size of any increase in value to be realized if the holder of a leasehold interest should decide to convert the property to its highest and best use has little impeaching effect upon the appraiser's judgment that the land should be valued as it currently exists. Considering this fact, we can see no abuse of discretion on the part of the trial court in refusing to admit it. Consequently, we decline to consider this evidence.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

McNAMARA and JIGANTI, JJ., concur.