In the Matter of the Estate of Albert B. Enoch,
Deceased.

Esther Corder, Petitioner-Appellant, v. Continental
Illinois Bank and Trust Company of Chicago, Ex-
ecutor of the Last Will and Testament of Albert
B. Enoch, Deceased, and Clara B. Enoch, Respond-
ents-Appellees.

Gen. No. 49,365.

First District, Fourth Division.

September 9, 1964.

Rehearing denied October 5, 1964.

 █

Joseph Keig, Sr., of Chicago, for appellant.

Tenney, Bentley, Guthrie & Howell, of Chicago (Kenneth B. Hawkins and William S. Warfield III, of counsel), for appellees.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a judgment of the Probate Court of Cook County, when after hearing, the court found that the petitioner, Esther Corder, had failed to prove her claim of a common-law marriage contract entered into between her and Albert B. Enoch in Colorado, and her petition was dismissed.

Albert B. Enoch died testate in Cook County, Illinois, on June 7, 1958. His will was filed in the Probate Court of Cook County July 10, 1958. On July 19 proof of heirship was made by Clara B. Enoch, the sister of the deceased, which showed that she was the only heir-at-law and next of kin, and that Albert B. Enoch was never married. The case went through the ordinary process in the Probate Court, and the Continental Illinois National Bank and Trust Company of Chicago qualified as executor of the will of Enoch. The estate was closed May 6, 1960, and the executor was discharged.

On November 30, 1960 Esther Corder filed a petition for leave to reopen the estate and to correct the table of heirship to show her as the widow of Enoch. An amended petition was filed on January 17, 1961, which prayed that the order closing the estate be vacated; that the petitioner be given leave to correct the table of heirship to show her as the widow of Enoch; and that she be given leave to renounce the will and elect

40

to take her share under the law and for her widow's award.

On February 23, 1961 the petitioner filed a second amended petition to reopen the estate, in which petition she alleged, among other things, that Enoch died June 7, 1958, in Ottumwa, Iowa; that letters testamentary were issued and his will admitted to probate in the Probate Court of Cook County on July 10, 1958, and that the table of heirship was entered and proved July 21, 1958 by Clara B. Enoch, a resident of Ottumwa, Iowa, without notice to petitioner; that the Continental Illinois National Bank and Trust Company of Chicago was then appointed executor; that Clara B. Enoch was the sole beneficiary under the decedent's will; that before the estate was closed an attempt was made to settle the alleged claim of the petitioner, and that without notice to her the estate was closed on May 6, 1960; that Clara B. Enoch had testified that Enoch had never been married, whereas she had no knowledge with reference to his marital condition.

The petition further sets up the petitioner's meretricious relationship with Enoch from 1926 until 1935, when she alleges that a common-law marriage took place in Colorado; that afterwards they returned to Chicago, each pursuing his respective business occupation [the petitioner was a stenographer]; that on many occasions they met and lived together as husband and wife in Chicago and in various other cities; "and further, that they continued to live and cohabit together and hold each other out as husband and wife from that date down to decedent's death"; and she prays that the order closing the estate be vacated and that she be given what rights she would have under law as the widow of Enoch. The petition was verified.

41

On April 3, 1961 the court denied the respondents' motion to dismiss the petitioner's second amended petition and allowed thirty days to answer the same. On May 3, 1961 the respondents filed a verified motion for summary judgment. On February 14, 1962 an order was entered denying the respondents' motion for summary judgment, and the respondents were given thirty days to answer the petitioner's second amended petition. On April 23, 1962 an answer was filed. The cause was heard and judgment was rendered against the plaintiff and in favor of the defendants. The judgment order was entered by the court on May 3, 1963, and from this final order the plaintiff appeals.

This action was brought to reopen a closed probate estate in order that the petitioner might prove that she was the common-law wife of the deceased and to have the table of heirship so show so that thereupon she could claim a widow's rights in the estate as provided for in the statutes.

The first issue we will discuss is whether the court properly sustained the respondents' objections to the testimony of the petitioner on the theory that her testimony could not be received because of the provisions of sections 1 and 2 of the Illinois Evidence and Depositions Act (Ill Rev Stats 1963, c 51, §§ 1, 2). That Act in section 1, changes the common-law rule and provides that no person shall be disqualified as a witness in any civil action, suit or proceeding because of his or her interest as a party. Section 2 sets out an exception to the general rule laid down in section 1 and provides that no party to any civil action, suit or proceeding shall be allowed to testify in his own behalf by virtue of section 1, when any adverse party sues or defends as the executor, administrator, heir, legatee or devisee of any deceased person. There are five exceptions to the rule set out in section 2.

The first exception permits an interested party to testify to facts occurring after the death of the deceased person. The second exception relates to testimony which may be admitted to rebut testimony of an agent of a deceased person regarding conversations or transactions between the agent and the party in interest. The third exception provides that if any party suing or defending testifies on behalf of a person suing or defending to any conversation with the opposite party in interest, then that party shall be permitted to testify to the same conversation or transaction. The fourth exception provides that if any witness not a party to the record testifies to any conversation of any adverse party in interest occurring before the death and in the absence of a deceased person, such adverse party in interest may also testify. The fifth exception deals with the right to admit the deposition of a deceased person in evidence.

The case which comes closest to the instant case is In re Maher, 210 Ill 160, 71 NE 438, in which Jessie R. Maher filed a petition in the Probate Court alleging that she was the lawful wife of the intestate and prayed that the court order the administrator to pay over her distributive share of the estate. The petitioner claimed that a common-law marriage had been entered into between her and the deceased Maher. The court pointed out that the only issue in that case was whether or not at the time of Maher's death the petitioner was or was not his wife, and that this necessarily resolved itself into a question as to whether a contract of marriage was ever entered into between them. That is the same issue we are now discussing in the instant case. The court cited Laurence v. Laurence, 164 Ill 367, 45 NE 1071.

In the Maher case the court states that it is a case which is to determine to whom an estate shall be distributed, and further states, at 210 Ill 169, 170:

". . . The real defendants to this suit are those, other than petitioner, who assert that they are the heirs-at-law, whether they be the brothers and sisters and their descendants solely, or the brothers and sisters and another claiming to be the lawful widow. The person who in this cause seeks to establish the fact that she was the wife of the deceased at the time of his death, if she testify, is testifying against the heirs of the deceased, and to do that she is incompetent. The theory of the statute is, that as the mouth of the deceased is closed by death, the mouth of the living who asserts a claim against the dead shall be closed by law. In adjusting their rights among themselves, those who are conceded or have been adjudged to be heirs of the deceased may testify each against the other. But a vastly different case is here presented. This petitioner seeks to swear that she is heir, and thereby establish the relation which, when not conceded, must be established by the judgment or decree of a court before she can testify. If she is competent, then any woman with whom a man has illicitly and openly lived and cohabited, both being then unmarried, has it in her power, after his death, to establish the fact that she is his widow by testifying that a contract of marriage was entered into by him with her when they were alone, in pursuance of which the cohabitation occurred, for none can deny her. It is precisely such an evil that the legislature intended to prevent by the enactment of section 2 of the chapter on evidence.

"We therefore hold that a woman claiming to be the lawful widow of a dead man, whose claim in that regard is denied by others who have interests, or assert interests, as heirs, in his estate, is incompetent to testify to the fact of her marriage

44

in a proceeding in which she seeks, as distributee, a portion or all of his personal property, until her status as such widow has been conceded or has been established by the adjudication of a court having jurisdiction of the subject."

In Laurence v. Laurence, supra, Maria Laurence filed a bill for partition against the heirs-at-law of Henry Laurence who died intestate, without descendants. She claimed to have been his wife at the time of his death by virtue of a common-law marriage. The Supreme Court determined that Maria was not an heir until she established the marriage which she alleged and which was denied by the heirs; and that until such marriage was established by proof or conceded, she was a stranger to the estate and was incompetent to testify in her own behalf.

It is true that in Pigg v. Carroll, 89 Ill 205, it was held that the husband of a party bringing an action as heir of an intestate, seeking partition of lands inherited, is a competent witness on her behalf. The court held in that case that the property involved belonged to the litigants and that it made no difference how they acquired the title to it, whether by purchase or descent, and that in that case they were not suing or defending in a representative capacity, as set out in the statute. That case is not applicable.

In 37 ILP Witnesses § 44, at page 37 it is said:

"Where the object of the proceeding, as in a will contest, is to take the estate from the devisees and legatees and distribute it among the heirs, the heirs have been held incompetent to testify as to facts occurring during decedent's lifetime. Far from the mere adjustment of rights between heirs at law, the object of a will contest is to take the property given by the will from the devisees and legatees, whether or not they are

45

heirs, and give it to the heirs; although the parties claim from the same source, they claim by different titles, on one side as heirs, and on the other side as devisees or legatees of a deceased person, and they are incompetent to testify, of their own motion, against one another."

Also see Fletcher v. Shepherd, 174 Ill 262, 51 NE 212; Waugh v. Moan, 200 Ill 298, 65 NE 713; and Mires v. Laubenheimer, 271 Ill 296, 111 NE 106.

 Under the rules laid down in the cases we have discussed, the objections interposed to petitioner's testimony were properly sustained in the trial court. The petitioner had been permitted to introduce certain evidence in the hearing in the Probate Court which commenced May 2, 1963. In that hearing a Miss Brecht testified that she had known the petitioner since 1943, and in that year the petitioner introduced her to Enoch, referring to him as her (petitioner's) husband; that she frequently saw Enoch waiting for the petitioner in the lobby of the building.

Portions of an evidence deposition of a Mrs. Buehler, a resident of California, were offered in evidence. In that deposition she stated that she had known the petitioner as a customer in the Swiss Specialty Shop in Chicago where she worked, and that she had met Enoch there when he had come to the shop with the petitioner to purchase china; that Enoch had said to the witness, referring to the petitioner, that his wife liked things in pairs; that the china was purchased and Enoch paid for it; and that the only time she had any contact with them was in the shop as customers.

The petitioner then introduced in evidence portions of the deposition of a Miss Sorem who lives in California. She testified that she had first met the petitioner about 1932; that the petitioner had a small apartment on Jarvis Avenue; that she thinks she moved from there to Sedgwick Street, and that she

46

had visited her in both apartments. She stated that she had met Enoch for the first time in the Jarvis Avenue apartment, and that she had seen them together on other occasions; that the one or two times at the Jarvis Avenue apartment and the one time at the Sedgwick apartment were the only times she was at the petitioner's home when Enoch was there.

C. W. Schild testified that he was employed by the Cable Piano Company and he identified a contract for the purchase of a Mason-Hamlin piano and bench. In the lower left-hand corner of the document there was a notation "Check A. B. Enoch." Objection to further testimony on the part of Schild was sustained and an offer of proof was made that if he was permitted to testify his testimony would be that a check had been received by the cashier from Enoch, although he had previously testified that he could not identify the handwriting on the notation. The objection to the offer of proof was sustained.

The petitioner was called to the stand and an objection was made by the respondents that she was incompetent under section 2 of the Evidence Act, commonly known as the "Dead Man's Statute." The court sustained the objection. The petitioner was permitted to testify as to her date of birth and to the fact that she had come to Chicago in 1923 and had first worked for the Kemper Insurance Company for about two and one-half years; that after that she went to work for the Rock Island Railroad as a stenographer in the law department; that at the time she was 24 years old and unmarried; that she first met Enoch there and that he was the general attorney for the Rock Island lines and was 42 years old. She was then asked whether she had seen Enoch outside of and away from her work at the Rock Island Railroad. This question was objected to on the ground that it could not be asked under section 2 of the Evidence Act.

47

Thereupon, the petitioner made an offer of proof that if she had been permitted to testify she would testify that she met Enoch in September 1925 at the Rock Island Railroad where he was employed as an attorney and she was employed as a secretary; and that about a month and a half after the first meeting Enoch took the petitioner to dinner and they had numerous dates going to dinners, dances and shows; that in December 1925 they went out to dinner, drank cocktails and that she passed out at the restaurant; that she woke up in a room in the Sherman Hotel; that later Enoch came to the room and they shared a bed in the hotel room. She would state that from that day forth the parties commenced living together; that they resided in various places in Chicago from that date until 1935; that during the relationship they had discussed marriage and that Enoch had refused, stating that they were not hurting anybody, that neither of them was going to marry anyone else, "so what's wrong with it?"

The petitioner would further testify that in the summer of 1935 she decided to break off the relationship and go to Colorado Springs, Colorado, where an aunt resided; that she went out to Colorado "with the purpose and intent of seeing whether she wished to live out there"; that she took an extended vacation from her employment at the law office and told Enoch where she was going; that she arrived at her aunt's residence in Colorado Springs about September 8, 1935, and that on September 10, 1935 Enoch came to her aunt's residence and said that she couldn't get away from him that easily, that she was his wife; she then introduced Enoch to her aunt as her husband. She would state that she told Enoch she was not going to return to their former relationship, and that he said they were married since they were in a common-law state; that she trusted him and took his

48

word for it; that they spent approximately two weeks in Colorado Springs, then returned to the Jarvis Avenue apartment in Chicago, and later lived at different addresses in Chicago. She would testify that at all the various places Enoch furnished payment for the expenses connected with the apartments.*

The petitioner would state that she had received and would offer in evidence various gifts from Enoch, including a ring, a charm bearing the inscription "Forever yours, Bert, February 8, 1947," a pen and pencil set belonging to Enoch, together with the china which Mrs. Buehler had testified to having been purchased, a receipt from the Hall of Gems at Excelsior Springs, Missouri, for two figurines, signed by the proprietor and made out to "Mrs. Albert B. Enoch" at 1442 North Sedgwick Street.

The court sustained an objection by the respondents to the offer of proof.

Dorothy Comer testified that she was a stenographer employed by an attorney; that she had known the petitioner since approximately 1930; that she had seen her many times afterwards and that at one time the petitioner opened her purse and took out her wedding ring and showed it to the witness; the ring had some engraving on it which the witness believed was orange blossoms spaced at intervals and that the

---

* The defense of the respondents states affirmatively that from 1928 until March 1958 Enoch resided continuously at The University Club of Chicago, at 76 East Monroe Street, Chicago, Illinois, where he maintained living quarters and from which address he registered and regularly voted until March 1958 at which time he returned to Ottumwa, Iowa, and lived with his sister continuously until he entered the hospital in Ottumwa, where he died on June 7, 1958.

The petitioner's reply to that defense did not specifically deny that allegation. Since the petitioner was not permitted to testify by the court, no evidence was introduced on the part of the respondents.

49

ring which the petitioner had marked in the hearing as Exhibit 3 looked like the ring. The witness was then asked whether she had any conversation with the petitioner in regard to the ring. An objection to this testimony was sustained. The witness testified that the first time she saw the ring was in the early 1940's.

Clara B. Enoch, called by the petitioner as an adverse witness under section 60 of the Civil Practice Act, testified that she lived in Ottumwa, Iowa; that she was the sister of the decedent, and that in 1956 the petitioner called on Miss Enoch at Ottumwa and introduced herself to Miss Enoch under the name of Esther Corder.

 During the time when the petitioner was making her offer of proof her counsel obliquely referred to an affidavit of Charles Bishop which had been filed as an exhibit in the summary judgment proceeding but which was not offered, according to the record, in the hearing before the court. In that affidavit, which was dated November 13, 1961, the affiant stated, among other things, that he was a first cousin of the petitioner and that in the summer of 1935 the petitioner and Enoch were in Colorado Springs, Colorado, where affiant was living at that time with his family, and that they resided as husband and wife at the home of his mother and were introduced as husband and wife. The court pointed out in its discussion that it could not properly consider documents which were a part of the summary judgment proceeding unless they were re-offered as evidence in the present hearing. Wigmore, Evidence § 1384, states that an affidavit is inadmissible. It is true that that statement is qualified and that there are certain exceptions to the rule therein laid down; however, even though under the circumstances in the case before us, Bishop's affidavit could

50

have been admitted, it would be necessary to have it formally offered and authenticated at the time of the hearing. This was not done and the affidavit cannot be considered by the court as a trier of the fact. See 1 ILP Affidavits § 13.

The petitioner in this court contends that sections 1 and 2 of the Evidence Act do not apply since section 57 of chapter 3 of the Probate Act (Ill Rev Stats 1961), sets out the way in which proof of heirship may be made. It is our opinion that this view of the effect of section 57 is erroneous inasmuch as the suit in this case is brought to vacate the order closing the estate, and that the petitioner be given leave to correct the table of heirship to show her as the widow of said decedent; that she be given leave to renounce the will and make her election to take her share under the law and for her widow's award; and that under that prayer the petitioner brings herself squarely under section 2 of the Evidence Act inasmuch as she is suing the executor of Enoch's estate. Nor can it be said that the fact that the petitioner did not receive formal notice of the opening of the estate and the proof of heirship affect her rights in any way. She was a woman experienced in the procedure in law offices. She knew that Enoch had died; she knew that he left a will; she knew that the will was going to be probated; she could have, if she had seen fit, filed an appearance in the estate, requesting that notices be served upon her; and then could have, if she saw fit, appeared at the proof of heirship and taken such steps as she might have deemed appropriate.

Without the testimony of the petitioner she has failed to make out a case, and even assuming that her testimony had been admitted and considered by the court, the court could properly have reached the same conclusion that there had not been a common-law mar-

riage in Colorado which would or could be recognized by the Illinois courts.

██ ██ The essence of a common-law marriage is that it is a contract or agreement to marry. The agreement must be that the parties presently intend to become husband and wife, contemplating a permanent union, exclusive of all others. In 26 ILP Marriages § 4, it is said, "The general rule of conflict of laws is that the marital status is governed by the law of the state of domicile. . . ." The Uniform Marriage Evasion Act (Ill Rev Stats 1963, c 89, § 19), which was first approved June 25, 1915, provides that if any person residing in this State, and who is prohibited from contracting marriage under the laws of this State, goes into another state or country and there contracts such a marriage, that marriage shall be deemed null and void in Illinois. In 1905 common-law marriages were abolished by statute in Illinois (Ill Rev Stats 1963, c 89, § 4), and all such marriages were held to have no force or effect whatsoever. See Stevens v. Stevens, 304 Ill 297, 136 NE 785; Lincoln v. Riley, 217 Ill App 571. In Wilson v. Cook, 256 Ill 460, 100 NE 222 (1912), a case decided two years before the Uniform Marriage Evasion Act became operative in Illinois, it is held that any state may enact laws which will personally bind its citizens while sojourning in a foreign jurisdiction and declare that marriage between its citizens in foreign states in disregard of the statute of the state of their domicile will not be recognized in the courts of the latter state, though valid where celebrated. The case further holds that where a state has enacted a statute lawfully imposing upon its citizens an incapacity to contract marriage by reason of a positive policy of the state for the protection of the morals and good order of society against serious social evils, a marriage contracted in disregard of the statutory prohibition, wherever celebrated, will be void in the

52

state of domicile. From the offer of proof in the record it could properly be held by the trier of the fact that both the petitioner and Enoch were domiciled in Illinois at the time the alleged common-law marriage took place in Colorado, and hence it would not be recognized as a marriage in Illinois.

The testimony in the record that Enoch, after the alleged common-law marriage in Colorado, had on some occasions referred to the petitioner as his wife while they were residing in Illinois; that they lived together in Illinois; that Enoch had made certain purchases for her, referring to her as his wife; and that he paid for the apartments in which she resided under her own name, is immaterial, and this evidence could support the continuance of the illegal cohabitation which the petitioner admitted existed between the parties prior to the Colorado episode. This evidence is immaterial since, without evidence in the record that there had been either a common-law or ceremonial marriage, no inference as to the licit relations of the parties can be drawn therefrom.

As was said In re Estate of Maher, 204 Ill 25, 31, 68 NE 159:

". . . The evidence in this record is voluminous. To attempt a discussion of it in detail would be futile. An impartial reading of it must lead the candid mind to the conclusion that her relation to him from the time they left Washington, and perhaps prior thereto, until she finally separated from him, was nothing more or less than meretricious, and that their living and cohabiting together, as between themselves, was known to be adulterous. His conduct was doubtless the more wicked and reprehensible, but neither the law nor public policy will permit the converting of such relations into the sacred relation of husband and wife."

53

The offer of proof of the petitioner that Enoch came to Colorado on September 10, 1935; that he told the petitioner that she was his wife; that the petitioner then introduced Enoch to her aunt as her husband; and that when Enoch told her they were married she believed him, and that they remained approximately two weeks in Colorado, is, under the Colorado law, not sufficient to establish a common-law marriage. In Taylor v. Taylor, 10 Colo App 303, 50 P 1049 (1897), the court discusses the essentials of a common-law marriage in the State of Colorado, and says:

". . . in this state a marriage simply by agreement of the parties, followed by cohabitation as husband and wife, and such other attendant circumstances as are necessary to constitute what is termed a 'common-law marriage,' may be valid and binding. . . . The great weight of authority is that the contract alone is not sufficient, unless it is followed by its consummation; that is, by cohabitation as husband and wife. . . . 'Cohabitation,' as here used, means something more than sexual intercourse. Bouvier defines 'cohabit' to be 'to live together in the same house, claiming to be married.' . . . Webster defines 'cohabitation' as 'the act or state of dwelling together, or in the same place with another.' 'It is not a sojourn, nor a habit of visiting, nor even a remaining with for a time. None of these fall within the true idea of cohabitation as a fact presumptive of marriage.' . . ."

See also Graham v. Graham, 130 Colo 225, 274 P2d 605 (1954).

The judgment of the Probate Court of Cook County is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.