SANDBURG-SCHILLER *et al.*, Plaintiffs-Appellees, *v.* LUIS F. ROSELLO, Defendant-Appellant.

First District (5th Division)   No. 82—1519

Opinion filed October 28, 1983.—Rehearing denied December 8, 1983.

Daniel J. Leahy, of Leahy & Eisenberg, Ltd., of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T.

320

Ferrini, John B. McCabe, and Philip H. Hilder, of counsel), for appellees.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Plaintiffs, owner/landlord and several tenants of an apartment building, filed a three-count complaint against defendant, a co-tenant, to recover damages suffered from a fire which originated in defendant's apartment and spread throughout the building. The three counts of the complaint sounded in negligence (count I), *res ipsa loquitor* (count II), and wilful and wanton misconduct (count III). The trial court directed a verdict for defendant and against plaintiffs on count III and, pursuant to separate jury verdicts, entered judgment for plaintiffs and against defendant on counts I and II. On appeal, defendant contends that: (1) under Illinois law, a landlord has no cause of action against a tenant for fires occurring during the term of the lease; (2) evidence of defendant's drinking was inadmissible without *indicia* of intoxication; (3) the trial court improperly limited the cross-examination of various witnesses as to possible causes of the fire; (4) the verdicts were against the manifest weight of the evidence and the trial court erred in denying defendant's motions for a directed verdict, judgment *n.o.v.* and new trial; and (5) plaintiffs failed to establish a *prima facie* case of *res ipsa loquitor*. In the alternative only, plaintiffs cross-appeal, contending that the trial court erred in directing a verdict on count III. In addition, plaintiffs allege that because defendant's notice of appeal was directed only to the jury verdict and not to the denial of the subsequent post-trial motion, this court lacks jurisdiction to consider the substance of the appeal. For the reasons that follow, we find that this court does have jurisdiction and affirm the judgment of the trial court.

PLAINTIFFS' CASE

At approximately midnight on December 10, 1974, or shortly thereafter on December 11, 1974, the Chicago fire department responded to a fire in defendant's seventh floor efficiency apartment at 88 West Schiller, Chicago. Testifying as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102), defendant stated that on the evening of December 10, 1974, from approximately 5:30 p.m. to 10 p.m., he attended a dinner party two blocks from his apartment. Approximately 10:15 p.m., he returned alone to his apartment. Generally, when it was early enough, he would have a cigarette and either read or watch television before going to bed. Although defendant recalled smoking

at the party, he could not recall whether he had smoked upon return-ing home. If he had smoked, however, he would have done so while sitting on the sofa in the living room area. Defendant admitted to be-ing a habitual smoker, having smoked for approximately 23 years. When he went to bed that evening, all electrical items, with the ex-ception of the clock in the bedroom area, were turned off. Defendant had never received an electric shock from any of these items, and all cords were in good condition.

Approximately midnight, defendant was awakened by a shortness of breath. Although his apartment was filled with smoke, he did not see any sparking or flames, nor did he feel any concentration of heat on one side of the apartment or the other. He opened the window on the north wall behind his sofa in the living room area, breathed the air for a few seconds and then ran out of the apartment and sat down on the common stairway to catch his breath. He then went down to the first floor. Defendant never called the fire department or at-tempted to warn any of other tenants. Although defendant recalled talking to some firemen that night, he did not remember the sub-stance of the conversation.

Defendant further testified that he lived alone in his apartment and had the only set of keys. On examination by defense counsel, defendant stated that he thought he went straight to bed after re-turning home from the party.

Next, Thomas Stuckey, security director for the apartment build-ing, testified as to the construction and the hot water convection heating system of the apartment. On the morning of the fire, Stuckey arrived at the scene approximately one hour after the fire department had been called. After the firemen left, defendant's apartment was locked. It was reopened to remove the drums of debris approximately one week later. The electrical system was left untouched for approxi-mately one week.

On cross-examination, Stuckey testified that the only recognizable furnishings in defendant's apartment after the fire were a floor safe, springs from a hide-a-bed, a metal filing cabinet, and sofa springs. The wood facing on the heating unit located on the north wall was charred and the center was missing and the kitchen cabinets were to-tally burned off the wall. The refrigerator and range were not re-moved until approximately two weeks later. On redirect, Stuckey ex-plained that the metal portion of the heating unit always remained cool enough to touch.

Next Lieutenant Andrew Blaine, Chicago firefighter, testified that in December 1974, he was assigned to investigate fires for the bureau

of fire investigation, a branch of the Chicago fire department which specialized in determining the cause and origin of fires. Blaine had been trained in investigation at the fire academy, had responded to over 10,000 fires and had investigated approximately 3,000 fires.

On the morning of December 11, 1974, Blaine and his partner, Ronald Drash, arrived at the scene of the fire after the main body of the blaze had been extinguished, went immediately to defendant's apartment, perused the area, talked to the firefighters who were overhauling the debris, talked to defendant, and made an investigation of the scene to determine cause and origin. When Blaine asked defendant what had happened, defendant told him that he had been smoking on his sofa after returning from a party and had dropped a lit cigarette on the sofa.

Blaine further stated that after he and Drash searched the apartment, eliminating various causes of ignition, it was their "opinion at that time *** that the fire had originated in the sofa by careless use of smoking materials." Although Blaine found some fire damage in the kitchen and bathroom, he was satisfied by the height and depth of the burning or charring that the fire did not originate there. Moreover, there was no indication of arson or of an incendiary fire. He has never seen hot water heaters or pipes cause a fire. Further, the burn patterns in defendant's apartment indicated that the fire had occurred on the north wall of the apartment in the living room area, outside of the radiator. Blaine noticed nothing unusual about the electrical circuitry. During the investigation, Blaine took notes which he referred to later that day when he and Drash wrote their reports.

On cross-examination, Blaine testified that although there was damage to the bedroom area wall and windows, it was clear that there had not been as much heat in the bedroom area as there had been over the sofa in the living room area. Blaine admitted that at one time he had stated that he thought the fire could have started in the hide-a-bed, but, at that time, he was under the impression that the sofa was used as a bed. Defense counsel then attempted to impeach Blaine by reading from a deposition taken in May 1975, in which Blaine stated that he thought the fire originated in the bedroom. In response, Blaine explained that he had been confused about the directions of the apartment at that time. Defense counsel then read from a deposition taken in October 1977, in which Blaine stated that: "We determined the fire had originated in the area against the wall where the sofa had been. *** I believe it was an interior wall." At trial, Blaine testified that the fire originated on the north wall which was an exterior wall. In response to whether he meant the wall

near the hi-fi, Blaine indicated that he was referring to the couch because when the window was opened above the smoldering couch, the oxygen would have raised the temperature of the fire and caused the more intense burning and charring in that area. Regarding the lighting in the apartment, Blaine indicated that although he is not an electrician, he inspected the lights "for signs of them burning, some such signs. I assume it wasn't electrical." There was no shorting damage at the outlet behind the couch.

Defense counsel then attempted to impeach Blaine on several points by reading from depositions in which Blaine had stated: (1) he did not know whether wires in the outlets were damaged; (2) he did not recall defendant's telling him that his dropped cigarette had caused the fire; (3) it could possibly have been an electrical fire caused by a malfunction of electrical circuitry behind the sofa. In response, Blaine testified that: (1) he never stated that he had examined the wires in the outlets; he merely looked at the outlets; (2) the questions asked at trial and during the deposition were dissimilar and required different answers; and (3) anything is possible; but in this case, all possibilities other than the cigarette had been ruled out.

Regarding televisions, wiring and electrical cords, Blaine admitted that he had heard that they can start fires. However, he had eliminated them as possible causes for three reasons: (1) no moving marks; (2) items were not turned on; and (3) he saw no other source of ignition other than a cigarette. Further, Blaine admitted that it is possible that there could have been other sources of ignition which he did not see. Blaine did not recall examining any of the electrical appliances, the hi-fi or the television, and admitted that it is possible that the cords he did not see could have caused the fire. However, he had never heard of an appliance that is turned off starting a fire and had never seen, read or heard of a lamp malfunctioning and causing a fire. On redirect, Blaine explained that as a lit cigarette burns into the material of a couch and falls below the surface of the couch, the heat which is contained in the area builds and eventually bursts into flame when sufficiently oxygenated.

Next, Donald Miller, causal investigative engineer, testified as to his examination of defendant's apartment five days after the fire. Regarding the electrical service, Miller explained that each apartment has its own electrical distribution system which distributes power throughout the apartment via various circuits to receptacles, switches or light fixture outlet boxes. Miller examined the distribution feeders and pipes which encompassed the wiring as well as every fixture-type box and receptacle to inspect for electrical damage, looking for evi-

dence of an electrical breakdown, *i.e.*, short circuit or fault. Miller explained that when a short circuit has occurred, there is generally vaporization of the conductive material. There was no evidence of short circuit vaporization or any type of fault in the wiring. Miller also examined the electric range and refrigerator and all electrical feeders to them and concluded that there was no evidence of an electrical breakdown. Based on his experience and examination of defendant's apartment, Miller stated, with a reasonable degree of certainty, that the electrical system was not involved in causing the fire. Further, because there was less significant burn damage in the kitchen and bathroom areas than in the living-dining area, Miller eliminated the kitchen and bathroom as areas of fire origin.

Miller further testified that because all of the debris had been removed from defendant's apartment by the time he made his inspection, he was not able to determine a specific cause. However, he was able to get a better idea of burn patterns. The most severe melting of plastic was found in the receptacle on the north wall of the living-dining area, near the air conditioner, indicating that this area was either exposed to the longest term burn or to the highest localized area of heat. In response to plaintiffs' counsel's hypothetical which asked Miller to assume all facts previously put into evidence, Miller stated that his opinion as to the point of origin of the fire, based upon a reasonable degree of scientific certainty, was that the fire started in the northwest corner of the living-dining area where the couch, table, hi-fi and end tables were located. As to the cause of the fire, Miller further stated, "Given the facts as I now know them, based on all of the photographs that are available to me and the testimony that has been made available for me to read, in my engineering opinion the fire being a smoldering type fire by necessity, because of all the smoke involved, originated in that couch." The bases for this opinion were: (1) burn and char patterns, (2) heat and metal discoloration patterns, (3) photographs, (4) general personal observations, (5) location of a fuel source in that area, and (6) defendant's observations.

Regarding the heating system, Miller stated that after examining the heater, he concluded that because the water temperature was far below the ignition temperature of combustible materials required to cause a fire, the heating system could not have caused the fire.

On cross-examination, Miller testified that although the wall behind the hide-a-bed in the bedroom area was partially gone, the burn and char patterns that were visible did not support the suggestion that the mattress had been smoldering. Further, because other metal objects in the apartment similar to the metal window frames behind

the couch did not melt, Miller assumed that there had been a concentrated fuel load in the melted frame area and, more probably, a longer term burn. Although the windows were boarded up and the aluminum frames concealed by the time Miller inspected defendant's apartment, he did see pictures of the outside of the building taken after the fire which showed no damage to the frames in the bedroom area.

Regarding the television set, Miller indicated that a television in the "off" position could catch fire only if it had an "instant on" feature. Regarding the lamp, Miller explained that when the switch is off, and the cord is plugged into an outlet, there is voltage running through the cord which might give a shock, but there is no electricity in the cord. Further, if a fault occurs between a receptacle and a switch, a resulting arc would generate substantial heat. Faults can develop over a period of time or occur spontaneously. However, when a fault causes an arc in a wire, there is some physical evidence of the occurrence at the receptacle, *i.e.*, loss of ductility in the building wiring and discoloration on the copper conductive material. If an arc occurs near the lamp itself, the heat will usually burn the insulation off the cord all the way back to the receptacle. In defendant's apartment, there had been on indication of arcing at the receptacles.

On redirect, Miller explained that when a television ignites, there is an open flame. Similarly, when arcing occurs, it generates a temperature in excess of 1900° F. which would immediately ignite materials in the vicinity, including the insulation material on the wiring, and cause an open flame, very little smoke and an odor. In Miller's opinion, a smoldering fire caused the oxygen deficient atmosphere in the apartment. The source of the smoldering fire would have to have been a source of energy that would be long-term in order to ignite fire-retardant materials that do not readily burst into an open combustible flame. Miller indicated that he would not expect a black and white television such as defendant's to smolder and cause a room to become oxygen deficient.

Next, Michael Boden, airline pilot and former tenant in the same building in which defendant resided, testified that prior to December 10, 1974, he had met with defendant twice for approximately 15 minutes each time to discuss the sale of defendant's couch and carpeting. At both of these meetings, Boden observed defendant's speech, complexion, and manner of walking and moving. On the night of December 10, 1974, approximately 11 p.m., Boden rode the apartment elevator with defendant from the lobby to the seventh floor where defendant exited. At that time, Boden noticed that defendant had an extremely flushed complexion, drooping eyelids, a generally slow man-

ner and was leaning against the corner of the elevator. Further, when greeted by Boden, defendant mumbled an incomprehensible reply and did not make any eye contact. When Boden queried defendant as to their ongoing negotiations regarding the purchase of carpeting and furniture, defendant indicated that he did not want to discuss it at that time. Based upon his experience and training in detecting unusual aberrational behavior such as intoxication, Boden was of the opinion that defendant was intoxicated on the evening of December 10, 1974.

On cross-examination, Boden stated that at his meetings with defendant, defendant spoke slowly and distinctly, with a Cuban accent. When Boden saw defendant in the elevator on December 10, he did not notice defendant staggering nor did he smell liquor on his breath. Boden admitted that there was nothing unusual about a person leaning against the wall of an elevator, but, in light of defendant's imminent move from the building, he did find it unusual that defendant did not want to discuss the sale of his couch and carpeting.

Pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102), defendant was then recalled as an adverse witness and testified that on the evening of December 10, 1974, he had had two glasses of wine with dinner. Further, defendant stated that he has been drinking wine with his dinner for 35 years and it does not make him intoxicated. He had had nothing to drink before or after dinner that evening.

DEFENDANT'S CASE

On direct examination, defendant testified that the black and white television which he had at the time of the fire was the type whose picture came on "right away." Defendant denied dropping a lit cigarette into his sofa on the night of December 10, 1974.

On cross-examination, defendant stated that he had purchased his television in approximately 1966 and that, at the time of the fire, it was in good condition, never having been repaired. On the night of December 10, 1974, the television was plugged into an outlet, although he was not sure which one. He did not see the television or anything else burning when he was awakened by shortness of breath.

Next, Ronald Drash, ex-fireman, testified that on December 10, 1974, while assigned to arson investigation for the Chicago fire department, he and his partner, Andrew Blaine, responded to the fire in question, and visually examined defendant's apartment for approximately one-half hour. Based upon his training in the determination of cause and origin of fires, Drash was of the opinion that careless use

of smoking materials caused the fire. At this point in the testimony, defense counsel moved that Drash be declared a hostile witness on the ground that defense counsel had called Drash in good faith and had been adversely surprised by his testimony. Outside the presence of the jury, defense counsel argued that in Drash's deposition, he had stated that the fire could have been caused by either a cigarette or electrical malfunction. Further, when defense counsel spoke to Drash at his home a few days before trial, Drash had confirmed his opinion as to the two possible causes. At trial, however, he limited the cause to only a cigarette. The court denied defense counsel's request on the ground that Drash had not categorically denied that there might be other causes and stated that when a witness gives a statement which is inconsistent with a prior statement, he does not automatically qualify as a hostile witness.

When questioning resumed in the jury's presence, Drash stated that he was not aware of an opinion that there could be another cause of the fire. Defense counsel then renewed his motion which the trial court granted. Thereafter, during defense counsel's cross-examination of Drash, Drash admitted to making the statements contained in the deposition, but stated that when defense counsel reread the deposition to him at his home several days before trial, he had stated that he did not understand the questions. He admitted that he had seen the remains of a television at the scene of the fire, but did not examine the inside of it. He did not recall seeing any lamps or electric cords, but did make a visual inspection of the heating unit.

Upon examination by plaintiffs' counsel, Drash stated that, based upon his investigation of defendant's apartment, he was of the opinion that the fire started on the "overstuffed couch" located in the northwest corner of the apartment. This opinion conforms to the report written by Drash and Blaine immediately after the fire.

Thereafter, defendant moved for a directed verdict on all three counts. The trial court denied the motion as to counts I and II, and allowed the motion as to count III, wilful and wanton misconduct.

Next, William Alletto, battalion fire chief for the Chicago fire department, testified as a rebuttal witness on behalf of defendant and stated that he had accompanied defense counsel to Drash's home a few days before trial and observed the conversation between Drash and defense counsel. At that time, Drash indicated that he did not have an exact opinion as to the cause of the fire and that the questions and answers in the deposition were true and correct. Alletto did not hear Drash state that he did not understand the questions.

On cross-examination, Alletto admitted that he was paid by de-

fense counsel to accompany him to Drash's home and to testify at trial. Alletto took no notes of the conversation between defense counsel and Drash, made no tape recording, and there was no court reporter present.

Thereafter, the defense rested its case and plaintiffs moved for a directed verdict as to counts I and II and a directed finding as to plaintiff's contributory negligence. The trial court denied the motion for a directed verdict and reserved its ruling on contributory negligence. Following plaintiffs' rebuttal testimony and offers of proof given outside the presence of the jury, the court denied plaintiffs' and defendant's respective motions for a directed verdict and also denied defendant's request for a rehearing on his motion to strike count II. In addition, the court granted plaintiffs' motion for a directed finding as to plaintiffs' contributory negligence on the ground that there was insufficient evidence to support the allegation. Following closing arguments, the jury returned with separate verdicts as to counts I and II, finding for plaintiffs and against defendant on each count. The trial court subsequently denied all post-trial relief and defendant's timely appeal followed.

OPINION

At the outset, plaintiffs contend that this court lacks jurisdiction to review the substance of this appeal because defendant's notice of appeal was directed solely to the jury verdict judgment and not to the subsequent denial of defendant's post-trial motion.

Supreme Court Rule 303(c)(2) (87 Ill. 2d R. 303(c)(2)) states that the notice of appeal "shall specify the judgment or part thereof appealed from and the relief sought from the reviewing court." While this requirement is considered to be jurisdictional, it is widely recognized in Illinois that the appellate court does not lose its jurisdiction because of technical errors which do not otherwise prejudice the parties. (*Peluso v. Singer General Precision, Inc.* (1977), 47 Ill. App. 3d 842, 851, 365 N.E.2d 390.) In *Peluso*, the relief requested in appellant's brief differed from that requested in their notice of appeal. Relying on *National Bank of the Republic v. Kaspar American State Bank* (1938), 369 Ill. 34, 15 N.E.2d 721, the *Peluso* court found that the discrepancy was merely a technical error and that defendants had been clearly apprised as to the substance of the appeal and, thus, were not prejudiced.

Similarly, in *Karris v. Water Tower Trust & Savings Bank* (1979), 72 Ill. App. 3d 339, 389 N.E.2d 1359, appellants' notice of appeal prayed for reversal of the judgment entered on April 7, 1977, but

failed to specify that the appeal was directed at both of the orders entered on that date. The court held that both orders were part of the final disposition of the issues and that appellees were "fairly and adequately notified of the judgment complained of and the relief sought." 72 Ill. App. 3d 339, 356.

After careful review, we find that plaintiffs' reliance on *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.* (1979), 78 Ill. 2d 56, 398 N.E.2d 3, and *Behner v. Hand* (1962), 190 Kan. 443, 375 P.2d 627, is misplaced. In *Illinois Central Gulf R.R. Co.*, appellant's notice of appeal sought review of the summary judgment order entered on April 5, 1978, and did not mention the earlier order of December 6, 1977, which dismissed the counterclaim. As a result, the appellate court ruled that the propriety of the dismissal order was not properly before it. Unlike in our case, the two orders were not essentially duplicative and the appeal of one order could not be said to have put appellees on notice as to the appeal of the second order. In *Behner*, appellant failed to file a motion for a new trial, or if he did so, failed to appeal from the trial court's order overruling that motion or to specify such ruling as error. Based on "a long-standing rule" of the court, the Kansas supreme court held that "when an appellant seeks to have this court review alleged trial errors, he must appeal from the order overruling his motion for a new trial, and, in addition, must specify such ruling as error. He must do both." Because Illinois law does not follow this rigid approach to technical errors in a notice of appeal, *Behner* is unpersuasive and noteworthy only for comparative purposes.

■ Under the circumstances present in this case, it cannot be argued that the jury verdict judgment, specifically noted in the notice of appeal, does not encompass all those points of error raised in defendant's post-trial motion. Therefore, we find that plaintiffs were sufficiently notified of the substance of the appeal and, consequently, suffered no prejudice from defendant's technical error.

We next address defendant's contention that pursuant to Illinois law, a landlord has no cause of action against a tenant for fires occurring during the term of the lease on the theory that the tenant is a third-party beneficiary of the landlord's fire insurance policy. This contention was initially raised prior to trial in defendant's motion for partial summary judgment against plaintiff-landlord and was denied.

We find *In re Estate of Enoch* (1964), 52 Ill. App. 2d 39, 201 N.E.2d 682, and *Logan v. 3750 North Lake Shore Drive, Inc.* (1974), 17 Ill. App. 3d 584, 308 N.E.2d 278, dispositive of the issue. In *In re Estate of Enoch*, an action was brought to reopen a closed probate es-

tate in order that the petitioner might prove that she was the common law wife of the deceased and thus have the table of heirship revised so that she could claim a widow's rights in the estate as provided for in the statutes. During the time she was making her offer of proof, petitioner referred to an affidavit which had been filed as an exhibit in the prior summary judgment proceeding but which had not been offered in the hearing before the court. The court stated that it could not properly consider documents which were a part of the summary judgment proceeding unless they were re-offered as evidence in the present hearing. On appeal, the reviewing court noted that while there are exceptions to the trial court's statement, the exceptions require that the documents be formally offered and authenticated at the time of the hearing before they can be considered by the court. 52 Ill. App. 2d 39, 50-51.

In *Logan*, plaintiff-lessee brought an action against lessor corporation seeking a declaration of her rights relative to the subletting of her apartment and for damages for defendant's refusal to consider and approve a prospective sublessee. Prior to trial, plaintiff-lessee's motion for summary judgment was denied. Subsequently, the trial court dismissed the proceedings on the ground that plaintiff had failed to introduce sufficient evidence to establish a *prima facie* case for relief in the nature of declaratory judgment or for the assessment of any damages against the defendant. In reversing the trial court's decision, the appellate court noted that defendant failed to introduce as evidence at trial those documents which were part of the summary judgment proceeding. As a result, the appellate court was precluded from considering those documents on appeal. 17 Ill. App. 3d 584, 590.

In the present case, the record indicates that defendant did not raise his exculpatory defense in the pleading; no testimony was offered to authenticate the lease at trial; and the lease was never offered into evidence at trial. Although the lease does appear in the record as an exhibit to defendant's motion for summary judgment, this does not constitute evidence. (*Giddings v. Williams* (1929), 336 Ill. 482, 488, 168 N.E. 514.) Defendant admits that he neither raised the lease provisions as a defense nor admitted the lease into evidence, but rationalizes his omission by stating that to raise the lease as a defense at trial after the trial court had already denied the summary judgment motion as a matter of law would have been pointless. In making this argument, defendant overlooks the most important reason for raising the defense at trial: to preserve the issue for appeal. (*Banwart v. Okesson* (1980), 83 Ill. App. 3d 222, 403 N.E.2d 1234.) Accordingly, we conclude that defendant has waived review of the lease provisions

by failing to plead, offer proof upon or raise the issue of exculpatory language during the evidentiary trial. Our decision as to waiver obviates the need to discuss the substantive aspects of exculpatory lease language as a bar to liability.

We next address defendant's contention that admission of evidence regarding defendant's consumption of alcoholic beverages on the evening of the fire was reversible error because there was no evidence of defendant's intoxication.

Evidence of alcoholic consumption is so prejudicial that more than mere drinking must be shown. Instead, actual intoxication must be established, indicating physical or mental capabilities. (*Wagner v. Zboncak* (1982), 111 Ill. App. 3d 268, 270, 443 N.E.2d 1085.) Whether a person is intoxicated are facts patent to the observation of all without the necessity for peculiar scientific knowledge and may be proven as other facts are proven, by the exercise of the perceptive facilities of the witness. (*Nystrom v. Bub* (1962), 36 Ill. App. 2d 333, 346-47, 184 N.E.2d 273; *Schneider v. Kirk* (1967), 83 Ill. App. 2d 170, 226 N.E.2d 655.) Further, intoxication may be shown by opinion evidence or by evidence of drinking intoxicants plus unusual behavior. (*McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 1044, 379 N.E.2d 890.) Whether a person is intoxicated is a question of fact for the jury and it is in their particular province to decide from all of the evidence where the truth lies. *Suppe v. Sako* (1941), 311 Ill. App. 459, 467, 36 N.E.2d 603.

In the case at bar, prior to trial, the trial court granted defendant's motion *in limine* which prohibited plaintiffs from introducing any evidence of consumption of alcohol without first establishing *indicia* of intoxication. Contrary to defendant's position, the trial court did not reverse its ruling on this motion when it allowed testimony as to defendant's consumption. Rather, prior to defendant's admission that he had had two glasses of wine at a dinner party that evening, Michael Boden testified that, in his opinion, defendant was intoxicated that evening. In support of his opinion, Boden stated that defendant had an extremely flushed complexion, drooping eyelids, generally slow manner, inarticulate verbal responses, drooped head, and made no eye contact during attempted conversation. Once Boden testified as to the *indicia* of intoxication, plaintiffs could then properly introduce testimony as to defendant's consumption of alcoholic beverages that evening. Accordingly, because we find that evidence of defendant's intoxication and consumption of alcohol were admissible, instructions relevant thereto were properly submitted to the jury.

We next address defendant's contention that the trial court im-

properly limited his cross-examination of various witnesses as to possible causes of the fire. In particular, defendant focuses on his cross-examination of Donald Miller, causal investigative engineer, Andrew Blaine and Ronald Drash, firefighters. After a thorough reading of the record, we find no support for defendant's contention.

Regarding Donald Miller: on direct examination, Miller testified that his investigation of defendant's apartment eliminated the electrical system, heating system and the range and refrigerator as causes of the fire. In arriving at this conclusion, Miller testified in detail as to what he had examined and the condition of various significant items. On cross-examination, over plaintiffs' objection, defendant was permitted to question Miller about the television as a possible cause of the fire. The court permitted such questioning on the condition that defendant would be introducing evidence to the effect that the television was an "instant on" type. Later, defendant was allowed to continue his pursuit as to the possibility that other furnishings or appliances could have caused the fire:

"DEFENSE: Mr. Miller, you do not know as a fact that none of the furnishings in here could have caused this fire, do you?

MILLER: I don't understand your question. Furnishings are not a source of energy.

DEFENSE: Well, furnishings including lights, the TV, the lamp, hi-fi, any of the electrical appliances.

MILLER: Are you talking [about] those items that are sources of energy?

DEFENSE: Yes, sir.

MILLER: Yes, sir. I do know as a fact they did not cause it.

DEFENSE: Well, Mr. Miller, if the TV here in our hypothetical is an instant on and that caused fire, you would have to examine the TV to find out whether or not it was the cause, wouldn't you?

MILLER: That's not the only fact that I have to put together to say it was or was not the cause. There are many other factors in any given fire that have to be considered.

And if the other factors that are known automatically eliminate that --

DEFENSE: Well, sir, it is certainly a major factor, isn't it, to examine the TV?

MILLER: Not necessarily, no."

With respect to the lamp as a possible cause of the fire, defendant presented a hypothetical in which the lamp was plugged in and the switch was off. Miller then thoroughly discussed the potential

energy in the wiring and the possibility of a fault. Defendant then presented another hypothetical in which a fault caused an arc in the wiring from the receptacle to the lamp. Miller stated that if that had occurred, there would have been evidence of loss of ductility and discoloration at the receptacle, both of which did not occur in this case. At this point, upon plaintiff's objection, the court asked defense counsel if he expected to introduce any evidence of arcing. Defense counsel replied, "Your Honor, no one even investigated it here. I think we're talking about a lot of speculation here." Later, when defense counsel again hypothesized as to the occurrence of arcing, the following colloquy ensued:

"COURT: *** I'm concerned with the materiality of this evidence if there's going to be no evidence of arcing.

DEFENSE: Well, Mr. Miller, let's put in the hypothetical this all burns up in the cord when the plug --

PLAINTIFF: Excuse me, your Honor, still counsel has not answered your question as if [sic] he is going to introduce evidence of arcing later on.

DEFENSE: I have said how can we. No one even investigated.

COURT: Then I must sustain the objection.

PLAINTIFF: All right. And your Honor, can you also strike out all the previous testimony in this direct line as to arcing since he is not going to bring it in?

COURT: It is going to be difficult for the jurors to do.

They've sat and listened through this for the past several minutes and I'm not sure that the Court can adequately or properly tell them you are not to consider the last three or four questions and they will know which they are to consider and which they are not to consider.

I am going to refuse that request because of the logistic problem."

Thus, it is obvious that even without the proper foundation (see *Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 33, 355 N.E.2d 336), defendant was able to elicit extensive testimony regarding arcing as a possible cause of the fire before plaintiffs finally objected. In addition, contrary to defendant's contention, we find extensive testimony by Miller on cross-examination regarding other possible causes such as the lamp and television set and, thus, conclude that the court did not improperly limit defendant's cross-examination of Miller.

Regarding Andrew Blaine: the record reveals that defendant was

given sufficient opportunity to query Blaine as to possible causes of the fire other than a cigarette. In fact, Blaine admitted that he had heard of television sets and electrical cords starting fires and further admitted that he had not examined any of the electrical appliances, hi-fi or the television set in defendant's apartment. Further, although Blaine stated that with a reasonable degree of certainty he was able to determine that a cigarette was the cause of the fire, defense counsel was permitted to continue questioning Blaine as to other possible causes to the point that Blaine stated that anything is possible. Moreover, defendant was given ample opportunity to impeach Blaine's testimony with statements from prior depositions. On recross, defendant continued to question Blaine as to alleged inconsistencies in his statements, at which point the following colloquy ensued:

"COURT: Are these the identical questions asked on cross-examination?

DEFENSE: Yes, but I am trying to bring up that he was mixed up on directions.

COURT: These are the identical questions that were asked of him on cross-examination. I am going to sustain the objection."

Later, in chambers, the court further stated:

"It seems to me what you are now asking is just a repeat of all this. If there is anything new, I will let you ask it; but if it's the same, I am going to sustain the objection."

Because defendant was given ample opportunity to query Blaine as to other possible causes as well as to impeach him with prior inconsistent statements, we do not find that defendant was improperly limited to his cross-examination of Blaine. See *City of Aurora v. Hillman* (1878), 90 Ill. 61, 66.

■ Regarding Ronald Drash: the record does not support defendant's contention that he was not permitted to elicit information regarding other possible causes of the fire from Ronald Drash. On cross-examination as an adverse witness, Drash admitted that he had not examined defendant's television set, and had not seen any lamps or electrical cords at defendant's apartment. Further, he had made only a visual inspection of the apartment's heating unit. During cross-examination, the court sustained plaintiffs' objections to questions regarding the heating unit as a possible cause of the fire on the ground that no evidence had been introduced as to the heating unit being a cause of the fire. It is well established that it is error to allow an expert to testify as to hypothetical situations based on facts which have not been put into evidence. (*Hahn v. Eastern Illinois Office Equip-*

*ment Co.* (1976), 42 Ill. App. 3d 29, 33, 355 N.E.2d 336.) Accordingly, we find the trial court properly sustained plaintiffs' objections regarding that line of questioning.

We next address defendant's contention that the verdict was against the manifest weight of the evidence and that the trial court erred in denying defendant's motions for directed verdict, judgment *n.o.v.* and new trial. Defendant argues that there was no probative evidence to support the submission of the negligence case to the jury because the testimony of plaintiffs' only significant witnesses, the fire investigators, was impeached by the use of prior inconsistent statements.

In deciding whether to direct a verdict or to enter judgment *n.o.v.*, it is incumbent upon the trial court to apply the standard enunciated by our supreme court in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, to the particular facts at bar. In the present case, when all the evidence is viewed in its aspect most favorable to plaintiffs, it cannot be said that it so overwhelmingly favors defendant that no contrary verdict based on the evidence could stand. In fact, in our opinion, it would have been highly inappropriate to direct a verdict in this case where there were numerous factual questions to be presented to the jury. *David v. Black* (1981), 98 Ill. App. 3d 1130, 1131, 425 N.E.2d 4.

It is undeniable that many of these factual questions arose from circumstantial evidence. However, this in no way diminishes their importance in reaching a verdict. Where there is no eyewitness, a party has the right to prove his allegations by circumstantial evidence, which consists of proof of facts and circumstances from which the jury may infer other connected facts, reasonably following from the proven facts and circumstances. (*Roth v. Meeker* (1979), 72 Ill. App. 3d 66, 80, 389 N.E.2d 1248.) Only when there is a complete absence of probative facts with which to support the conclusion reached does reversible error occur. *Lavender v. Kurn* (1946), 327 U.S. 645, 90 L. Ed. 916, 66 S. Ct. 740.

In our opinion, the facts and circumstances in the instant case constitute a reasonable basis for the jury's conclusion that defendant was responsible for the fire. The fire originated in defendant's apartment; defendant lived alone; he had the only key; and he was the only person in the apartment from at least the early evening hours of December 10, 1974, to the time of the fire. The electrical system, heating system, range and refrigerator were eliminated by experts as probable causes of the fire. Three experts testified that in their opinion the cause and origin of the fire was careless use of smoking mate-

rials on the sofa in the living-dining area. Defendant testified that he might have smoked in his apartment during the late evening of December 10, 1974. In fact, defendant told one of the fire investigators on the night of the fire that he had returned from a party, smoked a cigarette while sitting on his sofa and dropped a lighted cigarette into the sofa. At trial, defendant did not deny making this admission. Rather, he stated that he could not recall what he had said to the investigators. Experts testified that burn and char patterns coupled with defendant's description of the fire conditions when he awoke indicated a smoldering-type fire rather than an open flame-type which would have occurred from electrical arcing or ignition of a television set. Contrary to defendant's position, his attempts to discredit the testimony of plaintiffs' expert witnesses by the use of prior inconsistent statements were not grounds for a directed verdict. The credibility of the experts' testimony remained a question for the trier of fact. *Golden v. Big Bear Foods, Inc.* (1968), 102 Ill. App. 2d 237, 248, 243 N.E.2d 730.

Relying on *Systech Financial Corp. v. Vaughn* (Tex. Civ. App. 1977), 558 S.W.2d 105, defendant argues that the evidence resulted in an improper determination based on pyramiding inferences. In *Systech*, lessor instituted a suit against lessee alleging negligent use of smoking materials and, alternatively, negligent disposal of smoking materials by lessee. At trial, lessor introduced evidence showing that lessee was the tenant of the unit in which the fire originated, that lessee smoked, and that the fire started in a sofa in lessee's living room. Further, a fire investigator testified that, in his opinion, the fire was caused by careless smoking on the sofa. At the close of lessor's case, the trial court granted lessee's motion for a directed verdict on the ground that there was "no probative evidence to support the submission of [the] negligence case to the jury." (558 S.W.2d 105, 105.) In particular, the *Systech* court found that lessor was attempting to prove his case by pyramiding inferences, noting: (1) testimony revealed that lessee had spent very little time during the morning in question near the sofa where the fire originated; (2) testimony showed lessee sat on the opposite end of the sofa; and (3) there was no direct evidence that defendant was smoking on the sofa during the morning in question.

By contrast, in the present case, on the night of the fire, defendant admitted to the investigator that he had smoked that night while sitting on the sofa and had dropped his cigarette on the sofa. Further, at trial, defendant stated that if he had smoked in his apartment that night, he would have done so while sitting on the sofa. There was also

direct evidence as to charring and burn patterns and as to defendant's intoxicated condition on the evening of the fire. As a result, we conclude that there was ample probative evidence to support the submission of the case to the jury. Moreover, in light of the overwhelming evidence, both direct and circumstantial, we further conclude that the jury's verdict as to count I was neither unreasonable nor arbitrary, but was fully supported by the evidence. (*Brendel v. Hustava* (1981), 97 Ill. App. 3d 792, 423 N.E.2d 503.) Accordingly, the trial court's judgment will not be disturbed.

Finally, our decision to affirm based upon the negligence count obviates the need to discuss the *res ipsa loquitor* count, plaintiffs' alternate ground of recovery (Ill. Rev. Stat. 1981, ch. 110, par. 2—1201(d)), and precludes discussion regarding plaintiffs' cross-appeal which had been filed in the alternative only.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.